JOSEPH EVANS, *et al. vs.* RICHARD IGLEHART, JR. *et al.*
*December, 1834.*

S bequeathed all his real estate to his wife for life, and then devised as follows, "After her death, I will the tract of land H, together with all the personal property which may belong thereto *at her death*, to E and her heirs for ever. *Item*, I give to my wife for life, all my personal property not herein before disposed of, together with all the money of which I may die possessed; after her death I give the one half part of all my said personal property to the children of J, C and B, to be equally divided among them; and the same shall be divided immediately, or in a convenient time after the death of my said wife; the other half shall go to, and be vested in whomsoever my wife shall by last will direct. The widow appointed E to take under her power over the moiety of the personal property after her death. Some of the residuary legatees in remainder of S, filed a bill against the executors of S and his wife, and E the devisee of his wife for an account and distribution of S's personal estate among the parties entitled.

Upon the construction of the will IT WAS HELD,

1st. That the mere fact of giving the personal estate or the residue thereof, to one for life, with remainder over to another, does not of itself destroy the right of the legatee for life, under our testamentary system, to the enjoyment of the property *specifically*.

2d. That the intention of the testator ought to prevail, and in ascertaining that, the court will presume he had a knowledge of the testamentary law of *Maryland*, and the usages under it, and that he made his will in reference thereto, intending its execution accordingly.

3d. That the testator when he gave all his real and personal estate to his wife for life, did not intend that his executors should sell his personalty, and invest the same, and pay her its annual income for life.

4th. That the limitation over to E of all the personal property that might belong to the tract of land H at the death of the testator's widow, is conclusive evidence that the testator did not intend that the *general residue* of his estate should be sold and invested.

5th. When a surplus or residue bequeathed for life with remainder over, consists of money, or property whose use is the conversion into money, and which it could not for that reason be intended should be specifically enjoyed, nor consumed in the use—as a crop of tobacco or the like, an investment thereof must be made by the executor in some safe and productive fund; and most properly under the direction of the courts, so as to secure the dividends to the legatee for life, and the principal after his death, to the legatee in remainder.

6th. When any article of personalty, of such a nature *that its use is its consumption,* is specifically given to a legatee for life, with remainder over, the legatee for life takes the absolute property in the thing bequeathed, and the same rule applies when the consumable articles are comprised in the bequest of a general residue.

7th. That the wife of the testator S had no interest in the property devised by him except during her life. Upon her death one half of the balance of the personal property vested in the appointees named in her will, and the other moiety in the legatees in remainder designated in the will of S. The executor of the wife of S had no right to any portion of the property.

8th. A life estate in a chattel may be granted for life to one person, and the same, with *its issue* or *increase,* limited over to another; but this cannot be done but by express words or necessary implication. Applying this rule to the devisee of the personal property belonging to the tract called H, to E upon the death of the testator's widow, the *increase* thereof which became absolutely the property of the widow under the devise to her, did not pass to E. The testator only meant to devise what belonged to himself.

Where an executor is called into chancery to account for and distribute the estate committed to him, there is no principle which will warrant the court in regarding the same claim, as at one time conveying specific property with the profits accruing therefrom—*then* by an equitable fiction as being converted into money, and bearing interest—and again as attaching on the specific property whereon it originated.

Executors may claim an allowance for sums of money necessarily expended by them in clothing and maintaining the testator's slaves unable to work and maintain themselves, and similar allowances may be made to them in relation to slaves able enough to work and maintain themselves. Sometimes clothing is indispensable before they can be hired out, as slaves may be most profitably hired out, the executor furnishing clothing and maintenance—or where they are employed in finishing and preparing for market, crops on the testator's land, and by which the assets of the estate are sought to be increased.

Where a defendant in chancery, liable originally for property in kind, is charged with interest on its value, the plaintiff by thus charging him, re-

linquishes his claim to the property, which rests absolutely on the defendant upon his payment of its value. An election being once made out to charge the defendant, cannot at a subsequent period be prospectively retracted or abandoned, where the property still remaining in the possession of the defendant may have become greatly enhanced in value.

Clover and hay growing on real estate are not emblements, and do not as such form a part of the personal estate of a deceased. These pass to the devisee, and not to his executor. Neither of these articles whilst growing are the offspring of *annual* labor and cultivation.

Crops planted or sown by the testator in his life-time and which are gathered during the summer and autumn next succeeding his death, constitute a part of the personal estate.

The increase and income resulting from personal property, specifically bequeathed, when the assets are abundant to pay debts and legacies, enure to the benefit of the specific legatee, and form no part of the general residue of an estate.

In *England* it is the duty of the executor or administrator to collect and speedily reduce into money the personal assets when not otherwise directed. Such never was the practice of executors and administrators in this State, and such a course of proceeding is wholly inconsistent with the policy and provisions of our testamentary system; and particularly inapplicable to slaves.

Executors and Administrators in *Maryland* are required to divide specifically, or in other words, "in kind," between the legatees and distributees of the deceased, except so far as a sale may have been necessary for the security and benefit of the estate in respect to the particular property sold, and the payment of debts, legacies, funeral charges, &c., or where they are unable to make a satisfactory distribution amongst the claimants, then under an order of the Orphans court they are to make sale of so much of the surplus as consists of specifics.

Where an executor or administrator in his representative character is sued in a court of law, assets are presumed, unless as a fact, it be put in issue by the pleadings; but in a court of equity assets in his hands must be alleged, and if denied or not admitted, must be proved.

Since the act of 1832, ch. 302, this court is prohibited from reversing or affirming any decree of a court of equity, on the ground that the complainant has not in his bill by proper averments, shown himself entitled to the relief which has been granted, unless such defect was presented by an exception to the consideration of the court below, but still when neither the pleadings nor proofs show that the complainant is entitled to the relief extended to him, this court may reverse the decree.

An executor is entitled to a commission on the excess of sales over the appraisement.

Accounts passed by an executor before the Orphans court, pending a controversy in a court of chancery between the executor and claimant, are ad-

missible in testimony before the auditor of the Chancery court; they are however only *prima facie* evidence.

It is error in a decree of the chancellor not to make a final adjudication upon the whole subject matter before him.

So where certain personal property had been devised to A for life, remainder to the children of J, C and B, and to such persons as A should appoint by last will, and the property had been converted into money by the executor of the testator. On a bill filed for an account and distribution of the fund after the death of the tenant for life, by some of the remainder men, it was held, that all the remainder men were necessary parties, and for want of them the cause was remanded to chancery under the act of 1832, ch. 302, and that the administrator of A did not represent the persons appointed by her last will.

APPEAL from the court of Chancery.

The present bill was filed on the first of November, 1831, by *Richard Iglehart*, and others of the residuary legatees in remainder of *James P. Soper* deceased, against *Joseph Evans*, his surviving executor; *Charles R. Stewart* administrator *de bonis non*, *C. T. A. of Ann Soper*, the widow of the said *James P. Soper*, *Elizabeth Evans*, the residuary devisee and legatee of the said *Ann Soper;* and others of the residuary legatees in remainder of the said *James P. Soper*, for an account and distribution of his personal estate among the parties entitled.

From the pleadings and proofs in the cause it appeared, that *James P. Soper* died in the month of May, 1826, having first duly made his will, appointing the appellee, *Joseph Evans*, and his wife *Ann Soper*, (since deceased) his executor; in which will, after directing the payment of his dets, and giving certain pecuniary legacies, are the following clauses.

"I will and bequeath to my beloved and affectionate wife *Ann Soper*, all the real estate and lands of which I am possessed, lying in *Anne Arundel* county, and which consists of three tracts, to wit, "*Soper Hall*," "*Smith's Desire*," and about fifty acres of "*Westol's Resurvey*," for and during the term and continuance of her natural life. After her death, I will and dispose of the same in the manner fol-

lowing, that is to say, the tract of land called "*Soper Hall,*" together with all the personal property which may belong thereto, at the death of my said wife ; I will and bequeath to *Elizabeth Evans,* the daughter of *Henry* and *Catharine Evans,* to her and her heirs forever. *Item,* I will and give unto my dear wife, for and during her natural life, all my personal property of which I may die possessed, and which is not herein before disposed of, together with all the money of which I may die possessed. After the death of my said wife, I give the one half part of all my said personal property to the children of *Esther Iglehart* before named ; and the children of *Charles Soper* and *Barton Soper,* to be equally divided among them, and the same shall be divided immediately, or in a convenient time after the death of my said beloved wife. All the other half part of my said personal estate, after the death of my said wife, shall go to and be vested in whomsoever my said wife shall by her will direct ; I hereby placing it in her power, and authorizing her to dispose of the same as she may see fit and proper."

*Ann Soper,* the widow, died in November, 1830, and her will, dated January 23d, 1829, after bequeathing specifically to different persons several slaves, contains the following clauses.

"I give, devise and bequeath, unto *Elizabeth Evans* and her heirs for ever, as well all the residue of said personal estate and property, which I have the power as aforesaid, (under the will of my husband) to limit and dispose of, as all the estate and property, which I, in my own right may die possessed of."

It also appeared that portions of the personal estate of *James P. Soper* were sold by his executors on the 14th of November, 1826, and the 16th January, 1827, under the authority of the Orphans court, and that a further portion was sold by the surviving executor, *Joseph Evans,* on the 14th April, 1831. And it was admitted that all the residue of said personal estate not included in the two first sales, remained in the possession of *Ann Soper,* the widow,

during her life. It further appeared, that certain other portions of the personal estate of the deceased, died, perished, and was consumed by his family—and that the whole remaining residue was sold by the surviving executor, and the proceeds brought into the court of Chancery, under an order passed on the 12th December, 1832, with the consent of all the parties.

The case was referred to the auditor, who stated several accounts founded upon inventories, lists of debts due the deceased, accounts of sales, and accounts settled by the executor, *Joseph Evans*, with the Orphans court; the third and fourth of which accounts were passed after the filing of the present bill, and the service of the *subpoena* on the defendant, *Joseph Evans*.

Exceptions were filed to these accounts and report, which raised among others, the following questions—

1st. Whether by the will of the testator, his widow *Ann Soper*, was not entitled to the specific use and enjoyment of the residue of his personal estate for life, after the payment of funeral charges, debts and legacies; so as to exempt the executors and surviving executor, from accountability to those entitled in remainder, for any waste, destruction, or consumption of said property, while in the possession of the legatee for life; or for any interest, hire, or profits of the estate, or increase thereof, during the life of said legatee for life.

2d. Whether the executors, or surviving executor is responsible for any gain which may have resulted from sales of the property made during the same period.

3d. Whether the accounts settled by the executors with the Orphans court, including those passed after this bill was filed, are not *prima facie* evidence of the correctness of the allowances contained in them.

4th. Whether the executors are not entitled to an allowance for the support of the negroes and stock which were sold, from the testator's death until the sale.

5th. Whether the executors are chargeable with certain crops and parts of crops, on the land of the testator at the

period of his death as assets; or whether they belong to the devisee for life, *Ann Soper.*

6th. Whether the surviving executor is entitled to a commission on the sales made by him under the chancellor's order of the 12th of December, 1832.

7th. Whether that half of the property, to which the legatees in remainder were entitled upon the death of the testator's widow, should not have been sold by his executors, and the interest on the proceeds only, paid her during her life.

8th. Whether the legatee for life did not take an absolute estate in those articles, of which the use was the consumption, notwithstanding the bequest over.

And afterwards on the 8th of February, 1833, his honor, *Bland,* Chancellor, passed the following order—

This case standing ready for hearing, the solicitors of the parties were fully heard, and the proceedings read and considered. Whereupon it is ordered, that this case be, and the same is hereby referred to the auditor, with directions to state such accounts as the nature of the case may require. From the estate of the late *James P. Soper,* now to be accounted for, the auditor will exclude the carriage and horses given to *Ann Soper,* and the slave *Nick,* who was left free; and also all the property belonging to *Soper Hall,* given to *Ann Soper,* for life, remainder to *Elizabeth Evans,* which he will consider as consisting only of the slaves, horses, cattle, sheep and hogs, with their increase, and the provisions and provender necessary and proper for their support; and all the plantation utensils and implements of husbandry, such as ploughs, carts and the like. The auditor will also deduct from the sum total of the assets remaining after satisfying the creditors of the deceased, the pecuniary legacy given to *James Soper,* and the pecuniary legacy given to *Margaret Soper,* with interest on each from the 1st of *June,* 1827. The auditor will allow to the executor, *Joseph Evans,* all sums of money necessarily expended by him in clothing and maintaining such of the slaves named in the inventories, as were not able to

work and maintain themselves, and in bringing up, maintaining and clothing the increase of the slaves, as long as they continued a charge. The residue, to be thus ascertained, will be considered as including all articles of which the use was the consumption; the slaves with their increase, and also the use, labor and hire of such of them as may have been hired out or retained by the executors, with the increase of the other animate personalty : the crops begun by the testator on the land held by him in his own right, or in right of his wife, such as melons, cantalopes, cabbages, potatoes, clover, hay, wheat, rye, oats, corn, and tobacco, which were sown, planted, or gathered during the summer and autumn next after his death; and every kind of personal property, with its accumulations, as it actually or would have existed on the first of November, 1827, but for the negligence, misapplication, or waste of one, or of both of the executors of the testator *James P. Soper.* The auditor will charge the surviving executor *Joseph Evans,* with the whole amount of the residue, together with interest on the value of so much thereof as was sold under the order of the 12th of December last, from the first day of November, 1827, until the 14th day of January last, when that sale was made ; and with interest on the value of such other portions thereof as were not then sold, until the amount shall be satisfied by him. The auditor will state an account between the surviving executor, *Joseph Evans,* and the defendant, *Charles R. Stewart,* as administrator of the late *Ann Soper,* in which, he will award to *Stewart,* as administrator, all the interest on the aggregate value, with which the executor, *Evans,* is herein before directed to be charged, which accrued from the first day of November, 1827, to the third day of October, 1830; and he will charge the administrator, *Stewart,* in favor of the executor, *Evans,* with all such portions of the before described *residuum* of the personal estate of the late *James P. Soper,* and with the increase and accumulations thereof, as came to the hands of the late *Ann Soper,* and were misapplied, consumed, wast-

ed, or not accounted for by her. The auditor will allow to *Joseph Evans* as executor, a commission of five per centum, on the sales made under the order of the 12th of December last, and a similar commission on all other parts of his testator's estate, upon which no commission has heretofore been allowed. And then, after having first deducted the costs, expenses and commissions as usual, the auditor will distribute the balance among those entitled under the will of the late *James P. Soper*, who, as named in the bill of complainant, claim as legatees in remainder. According to these directions the auditor will make and report the necessary statements, from the pleadings and proofs now in the cause, excluding therefrom, however, the third and fourth accounts of the executor, *Joseph Evans*, passed with the Orphans court.

The report of the auditor made in pursuance of this order, was on the 25th of the same month duly ratified and confirmed by the chancellor; and appeals were prosecuted therefrom by all the parties, complainants and defendants.

The cause was argued before BUCHANAN, Ch. J., and MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*A. C. Magruder* and *Pinkney* for *Evans*, the surviving executor, and *Brewer* and *Randall*, for *Stewart, adm'r of Ann Soper, and Elizabeth Evans*, contended,

1st. That with reference to those articles of property of which the use has no separate existence, the widow had an absolute estate, notwithstanding the residuary clause. 3 *Merriv.* 190. 2 *Wms. Exrs.* 857, 8. 1 *Roper*, 209. 6 *Peters S.C. R.* 84. 2 *Paige*, 123. 5 *Johns. Ch. Rep.* 21, 334. 2 *Johns. Rep.* 243.

2d. In relation to the other articles, which are not consumed by the use, the widow was entitled to use them specifically during her life, and upon her death, the residuary legatees could claim nothing more than that which remained. They had no right to ask for a sale during her life.

This is the rule applicable to all cases of a bequest of personal property to one for life, with remainder to another. 3 *Ves.* 310. The testamentary system of *Maryland* discourages the conversion of personal property, and favors specific distribution. Act of 1715, *ch.* 39; 1798, *ch.* 101; *sub-ch.* 8, *sec.* 3, 4; *sub-ch.* 11, *sec.* 16; *and sub-ch.* 14, *sec.* 9.

3d. If however, the general rule be otherwise, there are circumstances in this case which will exempt it from its operation. The devise to *Elizabeth Evans,* of "*Soper Hall,*" with the property upon it at the time of the death of the widow, and not of the testator, must necessarily except this case from any such general rule. To say that *Miss Evans* is to receive with the farm, not the negroes, stock, &c., but cash in lieu of such property; or that she must claim, not according to the will, the personal property on the farm at the death of the legatee, for life, but at the death of the testator, is to make a new will for him, instead of expounding that which he made for himself.

4th. The provisions of the will in favor of the widow herself, show manifestly the testator's intention, that the negroes, stock, &c. should be kept by her during her life, in order to cultivate the farm. It never could have been the design of the testator that they should be taken from her and sold, and the interest paid to her, that she might be enabled to purchase or hire other negroes and stock. If he had so intended, he would have so said; and to do so, upon any artificial rule of construction, would be defeating his benevolent purposes towards her. The provision in favor of the widow, connected with the dispositions in favor of *Elizabeth Evans,* and the direction that the half of the property should be divided immediately, or in convenient time after the death of the former, show most clearly the testator's intention, that she should enjoy the use during her life time.

5th. The allowances made by the Orphans court are correct, including those for the support of the negroes. Settlements with that court, after a bill in Chancery against an

executor or administrator for an account, are *prima facie* evidence.

6th. The charges in the bill are not sufficient to warrant the decree. There is no allegation of any waste or consumption of the property by *Ann Soper* as *legatee,* and no relief is prayed against her as such. Relief is prayed against *Evans* alone, as surviving executor, or against him and *Mrs. Soper* as executors; and the accounts with the Orphans court are *prima facie* evidence that the losses were without the default of the executors; and the property consumed was consumed by the negroes and stock whilst in the possession of the executors. 2 *Paige,* 122, 132. 3 *Gill and Johns.* 424.

7th. The circumstance of the legatee for life being the widow of the testator, and as such, to be regarded as a purchaser for a valuable consideration, and not the mere object of testamentary bounty, should induce the court to construe the will favorably towards her. 4 *Harr. and Johns.* 480. 5 *Ib.* 59. 1 *Dessau.* 471, 500. 3 *Ib.* 49.

*Alexander,* for *Iglehart* and others, claiming as legatees in remainder, insisted—

1. That where a residue of personal estate is bequeathed to one for life, with remainder over, it is a general rule that the estate shall be sold within a convenient time after the death of the testator, and the proceeds thereof invested for the benefit of the legatees, according to their respective interests. And there is no indication in the will of *James P. Soper* of a particular intent that the residue of his personal estate should be enjoyed by his widow and other legatees specifically, so as to exempt this case from the operation of the general rule.

2. That it was the duty of the executors *ex officio* to have converted the estate of their testator; or if they doubted their authority, they ought to have applied to the court of Chancery for directions; and the court of Chancery was bound to administer the estate remaining at the time of the

decree, so as to place all parties interested as nearly as possible in like condition, as if the conversion had been made at the proper moment.

3. That in general, the time appointed by law for passing his first account, is a "convenient time," within which the executor should be required to convert the estate.   In this case the auditor under direction of the Chancellor has assumed that the conversion ought to have been made before the first day of November, 1827, being seventeen months after the probate of the will, and this date was properly assumed under all the circumstances of the case.   As consequences necessarily flowing from the foregoing propositions it will be insisted—

4. That the residue is to consist of the original or principal estate with all its profits, increase, and accumulations, as it existed on the first day of November, 1827, or would have existed but for the default of the executors—And the accounts reported by the auditor on the 16th day of February, 1833, will be sustained against all exceptions.

5. And that in addition to the expenses of administration and funeral charges, debts due by the deceased, specific and particular legacies, the executors are entitled to an allowance for all property perished or lost, &c. before the estate could be conveniently converted; and the surviving executor is entitled to allowance "for all sums necessarily expended by him in clothing and maintaining such of the slaves as were not able to work and maintain themselves, and in bringing up, maintaining, and clothing the increase of the slaves so long as they continued a charge."   But no allowance ought to be made for property perished, &c. or claims against the estate which accrued after the convenient time for the conversion.   It is the business of the executor to show his right to the allowances claimed by him, and in this respect also the auditor's accounts before mentioned will be sustained against all exceptions.

Upon the 1st point he referred to 2 *Wms. Exs*. 858. 9 *Preston on Legacies*, 119. 1 *Roper*, 209. 7 *Ves.* 137, 141, *and*

*note.* 9 *Ves.* 549.  3 *Merriv.* 193.  3 *Ves.* 310.  2 *Paige* 124; 132; 2 *Johns. Rep.* 243; 5 *Johns. Ch. Rep.* 346.

Upon the 3d, to the act of 1798, *sub-ch.* 8, *sec.* 14.  7 *Ves.* 94.  6 *Ves.* 520, 535, 539, 542.

Upon the 5th, to 3 *Ves.* 310.  1 *Simon and Stewart,* 189. 3 *Russel,* 301.

DORSEY, J., delivered the opinion of the court.

Although this case may be remanded to the court of Chancery, that the proceedings may be amended, further evidence taken, and proper parties made; yet it is incumbent upon this court to give their views of the various questions which were determined by the Chancellor, have been discussed here, and must arise and control the rights of the parties in the future litigation in which they may be involved.

It has not been made a defence in the answer of the surviving executor, that the whole, or any part of the testator's personal property, had been retained by, or delivered over to the legatee for life; on the contrary, by the whole tenor of his acts and averments, he by necessary implication admits, that the personal estate of the deceased still remains in the hands of the executors, subject to the decree or order of a court of equity. Had it consisted wholly of the specific articles set forth in the inventories, and in the due course of administration been delivered over to the legatee for life, but for the rule of the *English* court of chancery, (of which we shall presently speak,) all liability of the executors, *qua* executors, further to account therefor would have been at an end. The only remedy for the recovery or protection of their rights, which the legatees in remainder could have pursued, would be against the tenant for life, or her representatives, or those into whose hands the property may subsequently have passed.

All the accounts stated by the special auditor having been rejected, and the principles upon which a new audit was to be had, having been prescribed by the Chancellor in his or-

der of the 8th of February, 1833, as these principles will be carried out by him in his ultimate determination of this cause, it is our duty to review them, that they may not form the grounds of a second appeal to this tribunal.

The first instruction given for the auditor's re-statement of the accounts, is, "that from the estate of the late *James P. Soper*, now to be accounted for, the auditor will exclude the carriage and horses given to *Ann Soper*, the slave *Nick*, who was left free, and also all the property belonging to *Soper Hall*, given to *Ann Soper* for life, remainder to *Elizabeth Evans*, which he will consider as consisting only of the slaves, horses, cattle, sheep and hogs, with their increase, and the provisions and provender necessary and proper for their support; and all the plantation utensils, and implements of husbandry; such as ploughs, carts, and the like." As respects the carriage and horses, and negro *Nick*, the propriety of the order has not been, and cannot be controverted.   But with regard to the other property enumerated by the Chancellor, if the interpretation given to the order, by the auditor, in his subsequent statements under it, be correct, (and its correctness has been affirmed by the Chancellor in his final decree,) it is obnoxious to many objections, and in some respects works injustice to all the parties in this controversy.   It gives to the legatee in remainder, all the property specified which belonged to *Soper Hall* at the testator's death.   Whereas by his will, that only was given, which belonged to *Soper Hall* at the death of his wife.   There is nothing in the proof in this case, from which it can be ascertained what personal estate belonged to *Soper Hall*, at the testator's death, nor what part of his personal estate belonged to it at the death of his wife, unless the certificate of appraisement of *John Hall*, (of *Jesse*) and *Howard Miller*, was by some agreement of the parties, received as evidence thereof.   But even that does not in terms purport to be an inventory of *James P. Soper's* personal property, belonging to *Soper Hall* at the death of the widow, but an inventory of the personal property of *James P.*

*Soper*, late of *Anne Arundel* county, deceased, as it now (January 31st, 1831,) exists, after the decease of *Ann Soper*, his wife, who had a life estate therein, the same having passed to, and vested in *Elizabeth Evans*, the daughter of *Henry* and *Catharine Evans*, upon the decease of the said *Ann Soper*, in virtue of the said last will and testament of the said *James P. Soper*." Thus, these appraisers, not only undertake to state facts, but to adjudicate important rights, upon a statement of facts wholly insufficient to warrant their conclusions. The order may be unjust also to the legatee over, as being too limited in its enumerations— As for example, it does not embrace the household and kitchen furniture necessary to the comfort and accommodation of the slaves; the plank and other articles upon the farm, brought there for the repair of the buildings; and may exclude many portions of *James P. Soper's* estate, not belonging to *Soper Hall* at the testator's death, but passing under this bequest as belonging thereto, at the death of his widow.

As against the other legatees over, and the appointees by *Ann Soper's* will, it may be equally unjust, by depriving them of property not attached to the farm at the death of the widow, but may have been so at the death of her husband. It does equal injustice to *Ann Soper*, because it changes the property over which a power of testamentary appointment was given to her, and divests her of the increase of the property given to her for life, and of the absolute title to articles whose use is the consumption, and of which the law does permit the limitation over specifically after a bequest for life, even according to the *English* chancery rule before referred to.

The general position is not denied, that a life estate in a chattel may be granted for life to one person, and the same with its issue, or increase be limited over to another; but this cannot be done but by express words, or necessary implication. Here no such express words are used; no such necessary implication arises. The limitation over here is

"of all the personal property that may belong thereto, at the death of my said wife." To give it a literal construction, it would pass all the personal property belonging to *Soper Hall* at the widow's death, no matter who was the proprietor thereof. Such was not the design of the testator. He meant to dispose of what belonged to himself, not what might be subsequently acquired by others. The chancellor's order refers only to *James P. Soper's* property as being limited over; thus according to his exposition of the will exempting the effects of the widow from the operation of the bequest. Then, wherefore include the increase, which is as absolutely hers, and no more within the words or spirit of the bequest, than would be a horse purchased by her with the proceeds of *Soper Hall* farm, and used in the cultivation thereof at the time of her death.

The order further states, that "the auditor will allow to the executor, *Joseph Evans*, all sums of money necessarily expended by him in clothing and maintaining such of the slaves named in the inventories, as were not able to work and maintain themselves; and in bringing up, maintaining, and clothing the increase of the slaves, as long as they continued a charge. The residue to be thus ascertained, will be considered as including all articles of which the use was the consumption, the slaves with their increase, and also the use, labor and hire of such of them as may have been hired out, or retained by the executors, with the increase of the other animate personalty; the crops begun by the testator, on the land held by him in his own right, or in right of his wife, such as melons, cantelopes, cabbages, potatoes, clover, hay, wheat, rye, oats, corn and tobacco, which were sown, planted, or gathered during the summer and autumn next after his death, and every kind of personal property with its accumulations, as it actually, or would have existed on the first of November, 1827, but for the negligence, misapplication, or waste, of one or both of the executors of the testator, *James P. Soper*." Why the auditor was permitted to allow to the executor all sums of mo-

ney necessarily expended by him in clothing and maintaining the slaves who were unable to work and maintain themselves, but to reject all necessary expenditures for the clothing and maintenance of those able to work, and with whose hire he was to be charged, we are unable to discover any satisfactory reason. Such may have been the situation of the slaves, that clothing was indispensable before they could be hired out, or that they were most profitably hired out, the executor furnishing clothing and maintenance. At all events, it appears a strict rule of equity, which should deny to the executor all allowance for the clothing and maintenance of the negroes, during the time (between six and twelve months) they were employed in finishing and preparing for market the crops on the testator's lands in *Montgomery* county, an operation by which an increase of the assets of the deceased, was alone the object sought to be accomplished. After the first of November, 1827, under this order it would appear that the chancellor regarded the residue of the personal estate, to which the legatee for life, and those in remainder were entitled, as ascertained; and he directs the executor to be charged with interest on the amount thereof from that time, until the 14th of January, 1833, when the negroes belonging to the estate were sold. In January, 1833, the executor is made to account for the residue, not as ascertained in money, in 1827, but specifically, or which is the same thing, the proceeds of sale in 1833, of all that part of the deceased's estate, which appears to have greatly increased in value. To recapitulate then, the executors are compelled to account specifically for the personal estate, from the death of the testator, till November, 1827; from that time, according to a most useful and equitable rule of the court of Chancery, which regards that as done at the time at which it ought to have been done, considering it to have been the duty of the executors, in November, 1827, to have sold, and converted into money, and put out at interest, or invested in proper securities, the entire personal estate, it is assumed that they did so, and they

are dealt with accordingly; being charged with interest on the balance thus ascertained from that time until the 14th of January, 1833; although for aught that appears, or may be the fact, not one farthing of interest or income was received by them from the property in their hands. On the 14th January, 1833, the slaves having been sold by the surviving executor, for an amount far exceeding their appraised value, the rule before adopted, as far as the negro property is concerned, is from that time abandoned, and he is then made to account specifically, or which is the same thing, for its improved value, as shown by the sales of that day. There is no principle of law or equity, which will warrant a court of justice, (in a case like the present) to regard the same claim, as at one time covering specific property with the profits arising therefrom; then by an equitable fiction, as being converted into money, and bearing interest; and again as attaching on the specific property, whereon it originated. The rights of a claimant must be consistently urged. When in a court of Chancery, a defendant, liable originally for property in kind, is charged with interest on its value, the plaintiff by thus charging him, relinquishes his claim to the property, which vests absolutely in the defendant upon his payment of its value. An election being once made, so to charge the defendant, cannot at a subsequent period be prospectively retracted or abandoned, when the property, still remaining in the possession of the defendant, may have become greatly enhanced in value.

In enumerating the articles that are emblements, and as such form a part of the personal property of the deceased, the chancellor includes "clover" and "hay." In this we cannot agree with him. The crop of hay and clover growing on the real estate of the deceased at the time of his death, passes to his devisee, not to his executors. Neither of those articles, whilst growing, being the offspring of annual labor and cultivation. It is true that in *Wms. Exrs.* 451, it is stated, that "the growing crop of grass, even if sown from

seed, and though ready to be cut for hay cannot be taken for emblements, because as it is said, the improvement is not distinguishable from what is natural product, although it may be increased by cultivation. It seems, however, that the artificial grasses, such as clover, saint foin, and the like, by reason of the greater care and labor necessary for their production, are within the rule of emblements." Notwithstanding this authority, we cannot admit that a crop of clover from seed sown in the life-time of the deceased person is emblements. It possesses none of the characteristics of emblements. It is not a crop of annual labor, cultivation or sowing. It is not a grass as is alleged, for the production of which "greater care and labor" are necessary, than for ordinary grasses. On the contrary, much less labor, care and skill are necessary to raise clover than timothy, orchard-grass, or almost any other grass, requires. To sow the seed is the only labor or care which the clover itself demands for its production. It is not sown on land laboriously, or expensively prepared singly for its reception. But is sown early in the spring, in land already sown in rye, oats, wheat, or flax, and no additional labor or cultivation of any kind is used to prepare it for the clover seed. Concede that it is not a perennial grass, neither is it a grass of one year only, nor the subject of cultivation after it is sown. If the executor be entitled to the first crop of hay upon the principles upon which that right is founded, he has the same right to the crop of seed, cut in the ensuing fall, and even to the crop of the succeeding year. Clover seed though sown early in the spring, has no crop mown from it until the June, twelve month, following. Should the deceased die in the April or May succeeding the sowing, would his executors be entitled to the crop, to be cut more than twelve months afterwards? If so, who is to be in possession of the clover land in the interim? who is to enjoy the pasturage for the first summer and fall? If he is not in that case entitled, ought his claim to be allowed where the deceased died in the spring succeeding the sow-

ing, and has in the interim sown nothing, and bestowed nei-
ther labor or expense on the growing crop.   It would pre-
sent the strange anomalous case as to emblements, in which
the heir or devisee would take the crop sown, where the
decedent died within nine months after the sowing, but
had he lived a few months longer, such growing crops
would not have enured to the benefit of the heir or devi-
see, but be assets on the hands of the executor or adminis
trator.   In *Maryland* clover has never been held an excep-
tion to the rule applicable to other grasses.   The growing
crop of hay according to all the authorities is not emble-
ments.

Where the chancellor directing that there be included in
the residue of the testator's personal estate, (defining by
exemplification the subject of emblements) says, "the crops
begun by the testator, on lands held by him in his own
right, or in right of his wife, such as melons, cantelopes,
cabbages, potatoes, clover, hay, wheat, rye, oats, corn, and
tobacco, which were sown, planted, or gathered during the
summer and autumn next after his death," he is to be un-
derstood by the auditor as embracing only such of the enu-
merated articles, as were planted or sown in the testator's
life-time, and were gathered during the summer and au-
tumn next succeeding his death.   We do not concur in
that part of the Chancellor's order, which makes a part of
the residue that passes over to the legatee in remainder, the
increase and hire of the slaves, and other animate personal-
ty, with the accumulations and income from every other
kind of personal property, accruing before the first of No-
vember, 1827.   This is depriving the legatee of the bene-
ficial interest in the property bequeathed, for five months
longer than it appears ever to have been attempted in *En-
gland,* where numerous cases are reported.   In *Maryland*
the question is *"res integra,"* being now for the first time,
in the course of adjudication in this court.   In *England,* as
here, it is true as a general rule, that an executor has a right
to hold possession, as against legatees and distributees of the

entire personal estate of the deceased for one year. The grounds upon which this rule rests, are correctly given in the following paragraph from 2 *Wms. Ex'rs*, 855. "This allowance however, to executors is merely for convenience, in order that the debts of the testator may be ascertained, and the executor made acquainted with the amount of assets, so as to be able to make a proper distribution. Therefore, if the state of the testator's circumstances be such as to enable the executor to discharge legacies at an earlier period, they have authority to do so"—And for this is cited *Pearson vs. Pearson*, 1 *Sch. and Lef.* 12; and *Garthshore vs. Chalice*, 10 *Ves.* 13. If these be the reasons of the rule, and that they are cannot be denied, it follows as a natural consequence, that the increase and income resulting from personal property specifically bequeathed, where the assets are abundant to pay debts and legacies, enure to the benefit of the specific legatee, and forms no part of the general residue. If it did fall into the residue, then the power confided to the executor is not merely to pay debts, and execute the provisions of the will, but he has an important *quasi* testamentary power conferred on him, in cases of specific bequests of productive property, at pleasure, to give to or withhold from the specific legatees, an amount equal to from one tenth to one twentieth part of the value of the specific legacies; and by withholding it to confer it on the residuary legatees, or distributee, as the case may be. No such power was designed to be given him by the will; public policy and natural justice forbid its existence by implication.

Great efforts have been made in *England,* to establish a different principle where a residue is given to one for life, with remainder over to another. In that case it has been repeatedly insisted, by counsel, that the increase and income accruing during the first year after the testator's death, from the several species of property, composing the residue, shall not vest absolutely in the legatee for life; but that he shall have the same interest in it that he has in every other part of the residue, and that it passes over in like manner

to the legatee in remainder. We can discover no solid grounds of distinction between the rights of a legatee for life to the increase and profits of a specific legacy, from the testator's death; and the rights of a similar legatee, of a general residue to like interests from the same period. And although Ld. *Eldon* in *Fearns vs. Young*, 9 *Ves.* 549, said "it is not very well settled, whether the tenant for life is. entitled to interest from the death, or from a year afterwards;" yet his lordship lived long enough to settle beyond all controversy, that the tenant for life is entitled to the increase and income on the property bequeathed, from the death of the testator, as is fully shown by reference to *Augerstein vs. Martin*, 1 *Turn. and Russ.* 232.     *Hewitt vs. Morris*, 1 *Turn. and Russ.* 241.     *L. Terriere vs. Bulmer*, 2 *Sim.* 18, *and* 2 *Wms. Ex'rs.* 857.

The Chancellor does not explicitly declare, that in accordance with the *English* chancery rule upon the subject (as modified by his extension of the twelve to seventeen months,) it is the duty of the executor within the first seventeen months of his administration, to convert all the residue of the personal estate into money, and invest the amount thereof in some secure fund, that the tenant for life might thenceforth receive the dividends or interest thereof, until upon his death the whole might vest absolutely in those entitled in remainder. But from the character of his instructions given to the auditor, we cannot do otherwise than conclude, that in his opinion such were the obligations of the executors. To this doctrine as applicable to *Maryland* we cannot assent.

In *England*, "it is the duty of the executor or administrator, to collect and speedily reduce into money, the personal assets when not otherwise directed." 1 *Chit. Gen. Pra.* 528. Such never was the practice of executors and administrators in this State, and such a course of proceeding is wholly inconsistent with the policy and provisions of our testamentary system, passed in 1798, *ch.* 101, and with all antecedent legislative enactments upon the subject. So

far from its being incumbent upon the executor or adminis-
trator to reduce into money the personal assets, to do so,
would in most cases be a manifest violation of duty. They
are required to divide specifically, or in other words "in
kind," between the legatees and distributees of the de-
ceased, except so far as a sale may have been necessary for
the security and benefit of the estate, in respect to the par-
ticular property sold, and the payment of debts, legacies,
funeral charges, &c. or where they are unable to make a
satisfactory distribution amongst the claimants, then, under
an order of the Orphans court they are to make sale of so
much of the surplus as consits of specifics. The mere
fact of giving the personal estate or the residue thereof, to
one for life, with remainder over to another, does not of
itself destroy the right of the legatee for life, under our
testamentary system, to the enjoyment of the property
specifically. In *New York*, Chancellor *Walworth*, in *Cov-
enhover vs. Shuler*, 2 *Paige*, 122, appears to have adopted
the *English* chancery rule beyond even its fullest extent;
for although one-third of the residue of the testator's per-
sonal estate was given absolutely to the widow, and a life
estate to her during widowhood in the remaining two-thirds,
and in the entire real estate of the deceased; he decreed,
"that the widow was not entitled to the use or possession
of any specific article of the personal estate; but only to
one-third of the principal, and the interest or income of
two-thirds of the remainder of the general residue, after
the debts of the testator and the legacy to *Mrs. Cady* were
paid and satisfied. The complainants are therefore enti-
tled to an account of all the personal estate of the testator,
in value, as it existed at the death of the father," and that
two-thirds of the residue, "must be invested in permanent
securities, the interest whereof was to be paid to the wi-
dow, during life or widowhood." The executors and lega-
tee for life in the present case, are still more rigorously
dealt with. They are not charged only with the appraised
value of the personal estate, or in other words, its value at

the death of the testator, but are charged interest on the appraised value of the negroes, from November, 1827, till January, 1833, when they were sold, and also with their improved value at the death of the widow, all of which improved value is made to enure to the benefit of the legatees over.   By which method of liquidating the accounts, the widow is charged with interest for three years on the appraised value of eight negroes, whose ages at the time of her death varied from four to ten years, and who therefore during that time must have been an incumbrance and an expense to her, instead of yielding her any profit on account whereof she should have been subjected to the payment of interest.   This appears rather too severe a measure of justice to emanate from a court of equity, and its partial operation and inequality is rendered more apparent by adverting to the fact, that these negroes were appraised at $590, and sold for $1955.   This charge of interest was continued against the surviving executor until the year 1833, although it is manifest from the ages of the negroes, that the aggregate value of their services was not more than an equivalent for their support.   Suppose that instead of enhancement in the value of negroes, they had all died or run away, on whom would the loss have fallen? according to the chancery rule in *England* upon the executors.   But the case in 2 *Paige,* seems to have been decided simply upon reference to some *English* authorities ; the opinion of Chancellor *Kent,* establishing a different doctrine in *Westcoat vs. Cady,* 5 *Johns. Ch. Rep.* 334, being entirely overlooked.   There, the bequest was of a residue for life with remainder over, yet the Chancellor determined, that the proper bill for the legatee in remainder to file against the legatee for life, who was also the executrix, was "for the exhibition of an inventory."   Which determination *ex natura rei,* affirms the right of the tenant for life, to the possession and enjoyment of the residue specifically.   The question therefore cannot be regarded as definitively settled in *New York.*   In *South Carolina* it would appear,

that the law of that State is in accordance with the views of Chancellor *Kent*, as in *Johns vs. Johns*, 1 *McCord's Rep.* 132, where a testator owing few or no debts, gave his whole estate to his wife for life; the court say, that the cattle, horses, &c. of the testator, ought to remain on his plantation, and that the wife ought not to have been deprived of the use of them.

Whether the widow of *James P. Soper* ought to enjoy his personal estate specifically, or to receive nothing more than the interest on its value, is purely a question as to the intention of the testator, in conformity to which his will must be executed; there being no unbending principle of law to control such intention, whether it be in the one way or the other. The testamentary law of *Maryland*, then, looking to a distribution of the deceased's personal estate in kind, amongst legatees and distributees, and the practice of executors and administrators having been always conformably thereto, ought we not to presume that the testator had a knowledge of this law, and the usage under it, and that he made his will in reference thereto, contemplating and intending its execution accordingly. The same reasons which prompted the introduction of this Chancery rule in *England*, do not urge its adoption here. We have no *three per cent.* stock in this country as in *England*, in which it is the policy of the government, that all investments by the authority of the Chancery court should be made; nor have we any stock, judicially regarded, of such pre-eminent security, as to be the exclusive object of such investments. The nature of our personal property too, differs materially from that which is the subject of testamentary disposition in *England*. A considerable portion of our personalty consists of slaves, born in our families, humanely treated, faithfully serving us, and warmly attached to their masters and their connexions. To part with such property, even when under the influence of pressing necessity, is a severe trial to the feelings of the master. But voluntarily, and unin-fluenced by any such necessity, to subject them by will to

sale under the hammer, perhaps in foreign bondage, whilst his farms, to which they belonged, were distributed amongst his connexions and relatives, is conduct, the idea of which rarely if ever entered into the imagination of a *Maryland* land-holder.   We cannot therefore for one moment suppose, that when the testator gave all his real and personal estate to his wife during her life, that contrary to his express words thus used, his intention was not to give her any part of his personal property, but that his executors should sell and invest the same, and pay to her its annual income for life.   If such had been the meaning of the testator, he would have used appropriate terms to convey it to his executors. Is it natural to suppose, that it entered into the contemplation of *James P. Soper*, that upon his death, his widow should forthwith abandon his mansion at *Soper Hall*, that his favorite system of improving husbandry should be discontinued; his farms placed in the hands of impoverishing unsparing tenants; all his slaves, not even excepting his own body servant, or the waiting maid of his wife, sold, (and probably in foreign servitude,) and that not an article of his personalty, (his carriage and horses excepted,) should be specifically enjoyed by those objects of his bounty and affection, on whom he had so explicitly bestowed it.   But the limitation over to *Elizabeth Evans*, of all the personal property that might belong to *Soper Hall* farm at the death of the widow, is conclusive evidence that the testator did not intend, that the general residue should be sold and invested; as in that event, no part of his personal property could by possibility belong to *Soper Hall*, at the death of his wife.

If the surplus or residue thus bequeathed consists of money or property, whose use is the conversion into money, and which it could not for that reason be intended should be specifically enjoyed nor consumed in the use, but be by the executor converted into money for the benefit of the estate; as for example, a quantity of merchandise, a crop of tobacco or the like, an investment thereof must be made by

the executor, in some safe and productive fund, or it must be put out on adequate securities, and most properly under the authority and direction of the Orphans court, or a court of equity; so as to secure the dividends, interest, or income to the legatee for life, and the principal after his death to the legatee in remainder.

It is conceded in all the authorities which touch upon the subject, that where any article of personalty of such a nature that its use is its consumption, is specifically given to a legatee for life, with remainder over, the legatee for life takes the absolute property in the thing bequeathed. But in *Prest. Leg.* 95, 96, it is stated "that a specific bequest of things which are consumed by their use, vests in their legatees absolutely, though given for life; if they pass as a residue, then they must be sold, and the produce vested, and the interest paid to the tenant for life." In 2 *Wms. Exrs.* 858, the same position is asserted, but both these writers by referring as their authority to *Randall vs. Russell,* 3 *Merriv.* 194, do nothing more than repeat a loose *dictum* of *Sir Wm. Grantt,* in a case where he made no decision, and where no question arose on a disposition of a residue; the controversy relating to a specific legacy. And the distinction there suggested, between specific bequests and the bequest of a residue, receives no sanction from the doubt expressed by *Lord Alvanly,* in *Porter vs. Tournay,* 3 *Ves.* 310, adverted to by *Sir Wm. Grantt;* and in *Rop. Leg.* 209, it is said, that "the point however still suspends in doubt, as at the time when *Lord Alvanly* determined the case of *Porter vs. Tournay.*" But admit the distinction to have been solemnly adjudicated in *England,* (although in point of fact, no such adjudication can be found,) upon what is it founded? Why, as the aforementioned chancery rule converts the entire residue into money, there is no objection to limiting over such consumable articles; they are not to be specifically enjoyed or consumed by the legatee for life. The only reason assigned why a specific bequest, of that which is consumed by the use, vests the absolute pro-

perty in the legatee for life, is, the absurdity of limiting over that to another, which is wholly consumed by the first legatee, and of which therefore, there is nothing left that could be limited over.

But as in *Maryland* the articles composing a general residue are to be specifically enjoyed, the same principle that would vest the absolute property of a specific bequest of consumable articles in the legatee for life, would vest a like estate in a similar legatee in things consumable, part of a general residue.    Nay, the reason is stronger in the latter case than in the former, for if the court cannot in the case of such specific bequest, in order to avoid the total rejection of the words of limitation over, infer an intention of the testator, that the thing bequeathed should be sold and invested; *a fortiori*, they cannot infer such intention, when, as regards a bequest of a residue, no part of the limitation over is rejected as wholly inoperative, but its operation embraces all those parts of the residue not consumed in the use.

The Chancellor further orders, that "the auditor will state an account between the surviving executor, *Joseph Evans*, and the defendant, *Charles R. Stewart*, as administrator of the late *Ann Soper*, in which he will award to *Stewart*, as administrator, all the interest on the aggregate value, with which the executor, *Evans*, is hereinbefore directed to be charged, which accrued from the first day of November, 1827, to the third day of October, 1830; and he will charge the administrator, *Stewart*, in favor of the executor, *Evans*, with all such portions of the before described *residuum* of the personal estate of the late *James P. Soper*, and with the increase and accumulations thereof, as came to the hands of the late *Ann Soper*, and were misapplied, consumed, wasted, or not accounted for by her." The error in the time, and mode in which this aggregate is to be found, and the time from which the income or profits of the residue are to be credited to *Mrs. Soper*, have been before pointed out; but we have not expressed any opinion,

as to the nature or extent of the liability of *Charles R. Stewart,* the administrator of *Ann Soper.* We cannot concur with the Chancellor, that upon the record now before us, he is answerable for any portion of the *residuum* of the personal estate of *James P. Soper,* that came to the hands of *Ann Soper,* and was misapplied, consumed, wasted, or not accounted for by her, except by way of set-off, or discount from his claim against the surviving executor; the bill having not only failed to charge the fact of assets, but the proof in the cause furnishing no ground for the presumption, that *Ann Soper* left any personal estate, or if she did, that any part of it ever came to the hands of her administrator.

The rule upon this subject is different in a court of equity, from what it is at law. Where you seek to charge an executor or administrator, in his representative character, before the latter tribunal assets are presumed, unless as a fact it be put in issue by the pleadings; but before the former tribunal, assets in his hands must be alleged, and if denied or not admitted, must be proved. True it is, that by the act passed at December session, 1832, *ch. 302,* this court is prohibited from reversing or affirming any decree of a court of equity, on the ground that the complainant has not in his bill, by proper averments shewn himself entitled to the relief which has been granted, unless such defect was presented by an exception to the consideration of the court below; but the legislature have not as yet gone the length of enacting, that the court of Appeals must affirm a decree appealed from, where it neither appears on the face of the bill, nor the proofs in the cause, that the complainant is entitled to the relief which has been extended to him. Such is the predicament of the present complainants.

Of the Chancellor's direction to the auditor, "to allow to *Joseph Evans,* as executor, a commission of five per cent. on the sales made under the order of the 12th of December last," we cannot approve. The sale was made by him as

executor, and it was his duty to have made it, upon his being unable otherwise to make a satisfactory distribution amongst the parties entitled; which, from the nature of the property to have been divided, and the number of claimants in this case, could not possibly have been effected, but by a sale.    The whole course of his proceedings shows, that he claimed to hold the property sold, as executor, and consequently had not discharged himself from further accountability therefor, by assenting to its being passed over to *Ann Soper*, the legatee for life.    The will limits the commission to the two executors to five per cent.; he alone has received the whole amount, and there is nothing to induce us to believe, that the insufficiency of the compensation is so great, as to justify us in increasing it even if the executor had diligently and faithfully discharged the duties of his appointment.  · But such is not the attitude in which he stands before the court.   He has not settled up the estate in due time; delivered the portion of the residue which was in specifics to the widow, and taken from her the proper inventory therefor, nor has he invested or placed out on proper securities, such part of the residue as should have been money in his hands.   He is to be regarded therefore as a delinquent, not a meritorious executor, who having promptly and faithfully discharged his duties, asks an increase of his compensation.    He should have been allowed a commission of five per cent. on the excess of the sales, over the appraisement, and a similar commission on all those parts of the personal estate, whereon no allowance had heretofore been made to him.

· We dissent from the instruction given too, by the Chancellor to the auditor, to exclude in his statements the executor's third and fourth accounts passed before the Orphans court; this court having decided in the case of *Contee vs. Dawson*, that similar accounts, (that is, accounts passed by an executor before the Orphans court, pending a controversy in the court of Chancery, between the executors and a claimant,) were admissible in testimony before the auditor.

They are mere *ex parte* proceedings; only *prima facie* evidence, and perhaps ought to be subjected to a somewhat more suspicious and rigorous scrutiny, than if passed by the Orphans court before the commencement of the litigation in the court of Chancery.

There are other objections to the auditor's statements, made under the Chancellor's order of the 8th February, 1833, besides those resulting from the errors in the order itself, and which have been suggested in its examination. The executor is debited with the sum of $63 83, as gain on sales of parcel of the estate made April 14th, 1831; and how has this gain been ascertained? In the usual mode, by deducting the appraised value of the property sold, as shown by the original inventory, from the amount of sales? No. But by deducting from the produce of the sales the value of the articles sold, as it appears upon an unauthorised appraisement procured by *Evans* in 1831, after *Ann Soper's* death, and to which her administrator is in no wise connected as a party. If the auditor assumes this as the standard of the value of the several articles contained in it, wherewith the executor is chargeable, common justice requires, that to make him accountable according to that standard, you must debit or credit him, as the case may be, with the difference between that and the original appraisement. If this be not done, gross injustice is the inevitable consequence, and either the deceased executor of *James P. Soper*, or his legatees, must be injured to the precise amount of the difference between the two appraisements of the articles sold. As for example; suppose the value of the property sold per the first appraisement is $1000, by the second $500, and by the sales $1000; according to the auditor's mode of stating the account, as adopted in the present instance, the executors are to remain charged with the original appraisement of $1000, and to be charged with the additional sum of $500, the difference between the produce of the sales and the second appraisement, when in truth there was not one farthing gain or loss by the sales.

So, on the other hand, if the rule is intended to work both ways, should the first appraisement be $500, the second $1000, and the amount of sales $500, the executor must be credited with a loss on the sales of $500, when in fact the amount of sales, and the appraised value wherewith the executors have been charged are identical, and consequently no allowance whatever should have been made in either case. But the injustice and inaccuracy may perhaps be rendered more apparent, by tracing its effects upon the executors in a single article sold. A gig and harness in the original inventory is valued at $200, in the second at $90, and was per account of sales sold at $91 50. The executors stand charged in the auditor's accounts with the $200, the original appraised value, and are also charged $1 50, as gain on the sales, when in truth, their actual loss on the sale, as is self evident, was $108 50, with which they ought to have been credited. This mode of stating the accounts does no injury to the surviving executor, on the contrary he is a gainer by it, to the extent of his commission on the sum thus erroneously charged, and on the amount for which a credit ought to have been allowed. Upon the widow falls the entire loss. *Evans* is debited with the $1 50, which he has received, whilst the widow's administrator is charged with the $200, the appraised value, when in justice she ought to have been credited with $108 50, the loss actually sustained. Whether a proportionate loss has been incurred on all the other articles sold in April, 1831, and of consequence the widow's administrator, by the auditor's statement, stands burthened therewith, we have not deemed it necessary to inquire. We simply selected, to illustrate the error of the accounts, the article which by the report of the sales appeared to have been sold for the highest price. The inconsistency of the auditor's statements is most manifest from his own accounts, for in the very next item in his account, in ascertaining the gain from the sales of the negroes and some other property, he deducted from the amount of sales, the appraised value

from the original inventory, and charged the gain on the sales accordingly; thus repudiating the principle on which he had made the preceding entry.

The auditor, though acting under the Chancellor's order of the 8th of February, 1833, has not in all things conformed to it, and in one instance of his departure therefrom, has erred in a most important particular. Instead of doing as the Chancellor had properly directed him, to wit, "distribute the balance among those entitled under the will of the late *James P. Soper,*" he has in effect made one moiety of the amount thereof payable to *Charles R. Stewart,* administrator of *Ann Soper,* who has no pretence of right to receive any portion of it. *Ann Soper* had no interest or title to the property, except during her life-time, and consequently, nothing which could devolve on her personal representative. Upon her death one half of the balance vested in the appointees named in her will, and the other moiety in the legatees in remainder, designated in the will of *James P. Soper.* The auditor could not have supposed that any part of it was assets in the hands of her administrator, or that, as such, he could have claimed a commission thereon. If so, the amount to be received by the appointees of *Ann Soper,* would be less than that received by the legatees in remainder, contrary to the express provision of the will of the testator. Then why pay it into the hands of *Ann Soper's* administrator? A mere power of testamentary appointment, such as that wherewith *Ann Soper* was clothed, vests in her no right to the property over which it is to be exercised, that could possibly pass to her administrator. His claim to the whole balance is quite as well founded as that to one half.

Looking to the situation of the negro property, and the proof and admission in relation to the account of *Elizabeth Evans,* against the surviving executor of *James P. Soper,* we see no sufficient reason for its rejection.

We cannot concede to *Ann Soper* the unqualified right which has been asserted in her behalf, to all the interest

which accrued after the death of the testator, whether re-sulting from debts due to him in his life-time, or due to his executors or executor, for property by them sold.  So much thereof as was necessary for the purpose, must be first applied to the extinguishment of interest which accru-ed on the debts of the testator since his death, the balance thereof vests absolutely in the widow, as legatee for life.

The Chancellor's decree is erroneous in another respect. It is not a final adjudication upon the whole subject matter. The entire fund is brought before the court for distribution, under the wills of *James P. Soper*, and *Ann Soper*.  In the opinion of the Chancellor all the necessary parties are introduced.  Suppose then, (but for what reason we are unable to comprehend,) it was necessary for the one moiety of the balance, in its transit to the appointees named in *Ann Soper's* will, to pass through the hands of *Charles R. Stewart*, her administrator; ought it to have been per-mitted to rest there, to form the subject of a new Chancery suit, between the appointees and the administrator ? The decree should have gone further, and ordered its payment over by the administrator to the appointees.

The final decree of the Chancellor, overruling all ex-ceptions to the auditor's report, ratifying and confirming the same, and ordering a distribution accordingly, would be reversed; but as was intimated in the commencement of this opinion, this cause must be sent back to the Chancery court, from the want of proper parties: all persons inter-ested in the subject matter not being before the court, we are unable to make that full and final determination on the subjects in controversy, which the nature of the case de-mands at the hands of a court of equity.  All the appointees named in the will of *Ann Soper*, to whom any portion of the moiety of *James P. Soper's* personal estate, over which she had a power of testamentary disposition, was given, must be made parties in this suit, before any decree can be pronounced, by which their rights would be concluded.

This court therefore, agreeably to the provisions of the

act of Assembly, passed at December session, 1818, *ch.* 193, in order that *Ann Stewart, Catharine Stewart, Achsah Evans, Harriet Evans, Catharine Evans* and *Mary Evans* of *Anne Arundel* county, may be made parties in this cause, do award a writ of *proceedendo* for a return of the same to the Chancery court, and that a new trial thereof may be had. And in pursuance of the provisions of the act of Assembly, passed at December session, 1832, *ch.* 302, it further appearing to this court, after hearing and considering the appeal made from the decree in the court of Chancery, that the substantial merits of the cause will not be determined by reversing or affirming the said decree, and that the purposes of justice will be advanced, by permitting further proceedings in the cause, by the amendment of the pleadings, and the introduction of further testimony, do hereby order this cause to be remanded to the court of Chancery, for that purpose; and that it may be there tried upon its merits, and in conformity with the views expressed by this court, in the aforegoing opinion.

PROCEEDINGS REMANDED TO THE COURT OF CHANCERY.