MARGARET DUGAN, JOHN SMITH HOLLINS AND WIFE, AND ROBERT S. HOLLINS AND WIFE, *vs.* JOHN S. GITTINGS AND WIFE, ET AL.—*June* 1845.

Under the act of 1830, ch. 185, sec. 1, orders or decrees passed in an equity case, previous to the final decree, are open for revision in the appellate court by force of the very words of that act.

The act of 1841, ch. 11, repeals that branch of the 1st sec. of the act of 1830, ch. 185, which denies to a party the privilege of appealing from any decree which was not final in its character, and restored to him the right of an immediate appeal from the *particular decrees enumerated* in that section; yet it leaves in force the other branch of that section, as to the effect of an appeal from a final decree when taken.

The act of 1841, ch. 11, did not contemplate a total repeal of the act of 1830, ch. 185. It repealed only that portion of the latter act which had abridged the right of appeal.

Statutes in *pari materia,* are to be construed together.

A latter statute on a given subject, not repealing an earlier one, in terms, is not to be taken as a repeal by implication, unless it is plainly repugnant to the former, or unless it fully embraces the whole subject matter.

Where a father, in 1798, knew that his daughter had entered into an engagement of marriage, of which he approved, and being a man of fortune, declared it to be proper and just that he should make an advancement, in contemplation of marriage, to her, as he had done to another daughter; and accordingly, a short time before her marriage, announced his determination to give her a house, and in fact did verbally give it to her in fee, as a marriage portion. It appeared also, that the house was prepared for his daughter, and she placed in possession of it by her father, as her own property; that these arrangements were known to the intended husband, and the marriage there celebrated; that the parties there resided for some months, and from that period, the daughter, to the time of her death, in 1806, was in the enjoyment, under the gift, of the rents of the property, with the knowledge and consent of her father; sometimes paid to her by him, and sometimes by his agent. HELD: that these circumstances constitute a mass of proof upon the *factum* of the gift, which it is impossible to resist.

A mere verbal, voluntary, executory agreement, although founded on the meritorious consideration of love and affection, cannot be enforced by a court of equity, and the party who made it may, at his will, violate or abandon it.

An agreement made by a father with his daughter, in contemplation of her marriage, by way of advancement, and as a marriage endowment, followed by her marriage as then contemplated, has for its support a valuable consideration. It cannot be revoked by the father. The marriage is a consideration which vests the interest in the donee against all the world. The daughter is regarded as a purchaser, as much so, as if she had paid for the property an adequate pecuniary consideration.

Dugan et al. *vs.* Gittings et al.—1845.

The delivery of the property by the father to the daughter, under such circumstances, in pursuance of the gift and fulfilment of the condition on which it was to attach, withdraws the contract from the reach of the statute of frauds.

Performance of the consideration, and change of possession under the contract, are the two ingredients, which when combined, have always been regarded as relieving a parol agreement from the operation of the statute of frauds.

The answer of the widow and executrix of a father, who had made an advancement to his child of a *first* marriage, of which the respondent had no personal knowledge, is not within the general rule, that it can only be disproved as an answer responsive to the bill, by two witnesses, or by one witness with strong corroborating circumstances.

An answer which does not admit the allegations in a bill, puts the complainant on proof thereof, and leaves him to sustain them as they can.

Where a father made a parol gift of real property to a child, in contemplation of marriage, and executed the same by delivery of possession, the court will not infer, that subsequently, another piece of property was substituted by consent, the conduct of the father to the time of his child's death, and after the period when the alleged substitution was supposed to have been made, being entirely inconsistent with the existence of such consent.

The husband is tenant by the curtesy of the equitable inheritance of his wife.

*D*, the father, in 1798, made a parol gift of real property to his daughter, as a marriage endowment, and delivered her possession. Her husband in 1801, became a bankrupt, and assigned all his property to *D*. In 1806, the daughter died, leaving three infant children. In 1818, the husband died. To the period of the husband's death, *D* must be regarded as occupying the property in the character of assignee of the husband, and then, for the first time, the statute of limitations was put in motion by his adverse claim.

In the year 1820, one of the daughters came of age, and married in 1821. In 1822, another daughter married, and came of age in 1825. The son died unmarried. The bill was filed in 1837, before the lapse of twenty years from the death of the complainant's father, the bankrupt, to procure a conveyance of the house and lot, and an account and payment of the rents received by *D*, since the death of their mother, in 1806, against the heirs and devisees, and executrix of *D*. Held, that in the application of the statute of limitations:

1. That as to the daughter who married before she came of age, it was not competent for her to avail herself of any other disability than that of infancy, the disability which existed at the time her cause of action accrued.

2. A party is protected by the disability which exists at the time his right of action *first* accrued, because the case is within the express terms of the statute.

3. If there are in existence several disabilities, at the time the right of action accrues, the statute does not begin to run until the party has survived them all.

4. The operation of the statute cannot be prevented by cumulative disabilities. If subsequent disabilities were to be regarded, the right of action might be saved for centuries.

5. A court of equity, in applying the statute of limitations analogically, would not permit tho claim of a party to real property to be affected by any devolution of time short of that which would have barred him at law in action of ejectment.

6. If the parties, complainants here, could have recovered their rents from *D*, in an action of *indebitatus assumpsit*, or it was a case of concurrent jurisdiction, at law or in equity, then the act of limitations, in relation to personal actions, would have been a bar after three years.

7. The rents and profits in this case could not have been recovered at law, they would be payable only upon the successful assertion of title to the property, and as the contract resting in parol would have been void at law, no recovery in that court could have been obtained ; the doctrine of part performance is peculiar to the chancery courts, and is not regarded at law, as taking a case out of the statute of frauds. Hence limitations are no bar to the recovery of rents and profits in equity, under the circumstances of this case.

The case of *Caborne vs. Godfrey*, 3 *Ves.*, 517, overruled as to the plea of limitations.

Where an executrix alleges in her answer that she has received the assets of her testator, as shown by her return to the *Orphans* court, which she is prepared, when required, to produce, this is not an admission of the sufficiency of assets; and as the complainants failed to prove such sufficiency, this is a failure on their part to establish, by proof, a material allegation in their bill. The appellants, the defendants in equity, are not precluded by the act of 1832, ch. 302, from raising that question in this court ; and under that act the cause is therefore remanded.

APPEAL from the equity side of *Baltimore* county court.

The bill was filed on the 3rd January 1837, by *John S. Gittings* and *Eleanor A.*, his wife, and *James C. Gittings* and *Rebecca N.*, his wife, and alleged, that *Cumberland Dugan* was in 1798, seized and possessed of a very large real and personal estate. At this period the said *C. D.* had three children, one of whom, his daughter *A. D.*, was then addressed by *J. P.*, who afterwards became her husband; and another daughter, *Margaret Dugan*, who was then also addressed by *William R. Smith*, who afterwards became her husband, to whom respectively the addresses of said gentlemen were made,

with the knowledge and approbation of their said father, and the proposals of marriage of the said *J. P.* to the said *A. D.* having been accepted, and her marriage being in contemplation, her said father, by way of advancement to her, and as a marriage portion, before the marriage gave to and put the said *A.* into possession of a valuable lot and dwelling in the city of *Baltimore*, which said dwelling the said *C. D.* caused to be built for the reception of his said daughter, and her intended husband, and which said house and lot are now enjoyed and owned by said *A.* Your orators further state, that the said *C. D.* having thus advanced his said daughter *A.*, and his said daughter *M.*, then receiving with his, the said *D's* approbation, the the addresses of the said *W. R. S.*, he, the said *D.*, deemed it proper and just to make a provision for his said daughter *M.*, by way of advancement, and in contemplation of her marriage with said *S.*, similar to that which was thus made for said *A.;* and that accordingly, in the same year, and whilst his said daughter was receiving the addresses of said *S.*, with the consent of said *D.*, and in contemplation of their marriage, he, the said *D.*, with the knowledge of said *S.*, and before his marriage with the said *M.*, agreed to give, and actually gave to said *M.*, in fee for her settlement and advancement in life, and as a marriage portion, and as a provision for herself and husband, and the issue of their intended marriage, if any, the property situated and being in the city of *Baltimore*, being a three story brick house and lot, on the west side, &c. That the said *S.*, at the period of his addresses and marriage, and when said advancements and gift were made to his intended wife, was himself possessed of a considerable estate, exceeding in value the property so advanced to his said intended wife; that the said *M.* was, by her said father, put into the actual possession of the property so advanced to her by him, he putting her into possession thereof as her own, under said gift and advancement; that she, the said *M.*, being so put into possession of said property as her own by her said father, with the knowledge of said *S.*, the dwelling house on said lot was before her marriage, prepared and completely furnished in part by said *S.*, and in part by said *D.*, for the residence of said *M.*

and said *S.*, upon the celebration of their marriage; and that he, the said *S.*, so united in preparing and furnishing the same, with the knowledge of the said gift of the said property to the said *M.*, and believing her to be entitled to the same.   That on all occasions after the said gift, and particularly whilst the said house was so being furnished and prepared, the said *C. D.* spoke of the said gift to his daughter *M.*, and declared that it was intended as an advancement for her, and was made in contemplation of her said intended marriage, and that when the marriage was about to be celebrated, the said *M.* was put into possession of the same notoriously as hers, and her marriage with said *S.*, was with her father's knowledge and approbation, there celebrated on the 2nd October 1798; and the said *M.* and her said husband, immediately thereupon took possession and occupied said property, as the property of said *M.*, under said gift and advancement, and continued to occupy the same for a considerable time, as her property, and not only without paying any rent to said *D.*, but without any claim or pretence of title to the same by the said *D;* but on the contrary, they, the said *M.* and her said husband, holding, claiming and enjoying the same with the knowledge and consent of her said father, as the property of said *M.*, under the gift and advancement aforesaid; and your orators further charge, that the said *M. S.* and her husband, having so taken possession of and occupied said property, continued to occupy the same after the period of their said marriage, until sometime during the year 1799, when they removed therefrom; but after their said removal from it, and until the death of the said *M.*, which occurred in 1806, she, the said *M.*, continued to claim and hold, and receive and enjoy, with the knowledge and consent of her said father, all the rents, profits and issues of the said property, as belonging to her, the said *M.*, under said gift and advancement; and your orators also state, that not only during all this period, and they so claim the same, with the knowledge of the said *D.;* but also, that in several instances, the rents of the same were collected and paid to the said *M.*, as belonged to her by the agent of said *D.*, and that in several other instances, the said *D.* himself, collected and paid over

the rents of said property to his said daughter, as belonging to her, and that during the whole lifetime of the said *M.*, the said *D.* never pretended to have any title or claim whatsoever to the said property, but on the contrary, always acknowledged the same to be property of his said daughter *M.;* and your orators further state, that the said *M.* became the mother of three children by the said *S.*, to wit: *John M. Smith,* who is dead, intestate and without issue; your orator, *Eleanor A. Smith,*, now the wife of your orator, *John Gittings;* and *Rebecca A. Smith,* now the wife of your orator, *James C. Gittings;* and the said *Eleanor A.* and *Rebecca A.,* your complainants, are the only heirs at law of the said *Margaret* and said *William R. Smith;* that before the death of said *Margaret,* the said *William R. Smith* had become unfortunate, had failed in business, and ceased to pay any attention to this property up to the period of his death, which occurred on the 10th June 1818; that immediately upon the death of *M.,* the said *D.* took the charge and management of said property on *Market Space,* rented the same out to tenants and collected the rents of the same from that period up to the day of his death, placing the money thus received among his own money, using and employing the same as his own, and has never rendered any account to your orators therefor. And your orators further state, that the said *C. D.* hath also, by his last will and testament, among other things, devised and bequeathed as follows: "I give, devise and bequeath to my friend, *Isaac McKim,* his heirs and assigns, the following property, in trust for my grandchildren hereinafter named, as follows, that is to say, my three story brick house and the lot on the west side of *Market Space* or *Cumberland Row,* in the city of *Baltimore,* situate about, &c., which pieces of property I hereby devise to the use of my two grandsons, namely, *C. D. Hollins,* son of my daughter *Cordelia Margaret,* and *Cumberland Dugan Hollins,* son of my daughter *Rebecca,* their heirs and assigns as tenants in common to be conveyed to them by my trustees, when they respectively attain the age of twenty-one years, and in the meantime to pay over the rents, issues and profits of the same to my wife during the term of her natural life, if she should live so long;

and on the event of her death, before my said grandchildren attain to the age of twenty-one years respectively, to pay over the rents, issues and profits thereof to my daughters, *Rebecca Hollins, Cordelia* and *Margaret Hollins,* equally, and in further trust to convey the same in fee simple, should my said grandsons, or either of them, die before the said age of twenty-one; that is, one moiety to the use of my daughter *Cordelia Margaret,* in fee, if her son dies before the said age, and the other moiety to the use of my daughter *Rebecca,* if her said son should die before he attains the said age." Which will has been duly admitted to probat, the said *Cumberland* having, since the making thereof, died, and your orators are ready to produce a duly authenticated copy thereof, &c.; charge that by the said will, the said *C.* appointed his wife, *Margaret Dugan,* his sons, *Hammond Dugan,* and *Frederick James Dugan* and *William McKim,* executors of his said will, but that the three last having renounced the execution of said will, letters testamentary have been granted to the said *Margaret,* alone, who hath received into her hands assets more than enough to pay all claims due by the deceased, *C. D.* And your orators further state, that *E. A.* and *R. A.,* two of your orators, were married whilst minors, and have remained under coverture ever since, and that *Rebecca Dugan,* daughter of said *C.,* is married to *John S. Hollins,* and that *Cordelia Margaret,* another daughter of said *Cumberland,* is married to *Robert S. Hollins.* And you orators further state, that during the life time of said *C.,* and within three years before the filing of this bill, your orators often time applied to him for a conveyance of said house and lots, and for an account and payment of the rents and profits by him received therefor, and since his death they have applied to said executrix of said *Cumberland,* and the other defendants therefor, all of which reasonable requests have been constantly refused by them, all of which actings, &c.

Prayer, that the defendants may be decreed to convey the said property mentioned and described as given to said *M. S.;* that said defendants be forever enjoined from intermeddling with

or claiming title to the same, and that the said executrix of said *Cumberland Dugan* may account, &c.

The joint and several answers of *Margaret Dugan*, *John Smith Hollins* and *Rebecca Hollins*, his wife, *Robert Smith Hollins* and *Cordelia Margaret Hollins*, his wife, alleged it to be true, that *Cumberland Dugan* was, in the year 1798, seized and possessed of a considerable real and personal estate, the value of which these respondents believe to be greatly exaggerated by the said complainants in their said bill of complaint. That at that period, the said *C. D.* had three children, viz, *A.*, who intermarried with *J. P.*; *M.*, who intermarried with *William R. Smith;* and *George Dugan;* and that as these respondents are informed, and believe, *Margaret's* intermarriage with the said *William R. Smith* was before the intermarriage of *A.* with the said *J. P;* that they are unable to state the precise dates of either of said marriages; that the house and lot fronting on *Gay Street*, &c. These respondents, further answering, deny that the said *C. D.*, by way of provision or advancement, or in contemplation of the intermarriage of his daughter *Margaret*, with *William R. Smith*, in the year 1798, or at any other time, upon any other consideration, gave or agreed to give to the said *Margaret*, in fee for her allotment and advancement in life, as a marriage portion or provision for herself and husband, and the issue of their intended marriage, if any, the property being and lying in the city of *Baltimore*, being a three story brick house and lot, on the west side of *Market Space*, or *Cumberland Row*, situate about thirty feet north of *Pratt Street*, and between, &c., having a front of about twenty-seven feet, and a depth of about sixty-five feet, together with a lot in the rear thereof, purchased by the said *Cumberland Dugan* of *John O. Donnell*, particularly described in said bill of complaint. That after their intermarriage, the said *W. R. S.* and *M.* his wife, occupied, for a short period, a house and lot on *Cumberland Row*, belonging to said *C. D.*, but whether the house and lot described by the complainants in their said bill of complaint, these respondents neither admit nor deny, but they aver, that it was so occupied by the consent and sufferance of the said *C. D.*, without their

paying any rent therefor, and that they went into the possession of the same as the property of *C. D.*, and not as their own. They aver, that the title to said property never was in the said *W. R. S.*, or *M.*, his wife, but that the same was, and remained in *C. D.*, who never parted, or intended to part therewith, and that the occupancy or possession of this or any other house on *Cumberland Row*, belonging to said *C. D.*, by said *W. R. S.*, and *M.*, his wife, never was regarded by said *D.* as a possession connected with title, or a claim of property, but as permissive on the part of said *D.*, for the temporary accommodation and convenience of his daughter. These respondents further answering, deny that after the said *W. R. S.*, and *M.*, his wife, gave up the possession of said property, and until the death of said *M.*, (which they admit to have occurred in the year 1806,) she, the said *M.*, continued to claim, hold, receive and enjoy, with the knowledge and consent of her father, *C. D.*, the rents, profits and issues of said property, as belonging to the said *M.*, under any supposed gift or advancement, or that the said *Cumberland Dugan* ever admitted her right to receive such rents and profits; on the contrary these respondents affirm, that the said *C. D.*, at all times, as well during the occupancy by said *W. R. S.* and wife, of the house and lot on *Cumberland Row*, as afterwards, not only up to the death of *Mrs. Smith*, but up to that of his own death, continued to exercise all proper acts of ownership over said property, by paying taxes, receiving all rents, making all repairs, alterations, &c., the same as he did in regard to all other property of which he was possessed, and to which he had title; and that not only did the said *Cumberland* so exercise all acts of ownership over said property, with the knowledge and without the molestation of said *W. R. S.* and wife, or either of them, under any pretended claim of title, but that from the period of the death of said *Margaret*, till that of the death of *W. R. S.*, her husband, which occurred in the year 1818; the said *C. D.* continued to manage and deal with said property as his own, without any question of his right so to do by the said *W. R. S.*, and without any pretence that the same had been given to the said *Margaret* by the said *C.* These respondents, further answer-

ing, insist for further defence upon the provisions of the *statute of frauds and perjuries* as a sufficient answer to the claim of property asserted by the bill of complaint of the said complainants. These respondents admit the death of *W. R. S.*, and *M.*, his wife, and that the complainants are their only living children and heirs at law. They likewise admit the death of *C. D.*, and the execution of his testament and last will which has been duly admitted to probate, and that the devise of the property herein before referred to, is correctly recited by the complainants in their said bill. They also admit, that by said will, the said *C. D.* appointed his wife, *Margaret Dugan*, and his sons, *Hammond Dugan*, *Frederick James Dugan*, and *William McKim*, executrix and executors, the three last of whom have renounced said trust, and that letters testamentary upon said estate have been granted to said *M. D.* alone, by the *Orphans* court of *Baltimore* county, who has received the assets shewn by her returns to said *Orphans* court which she is prepared to produce whenever the same may be required. These respondents are unable particularly to state, the amounts received by *C. D.* for the rents of the property referred to in this answer, nor the persons from whom, or the times when the same were received. These respondents have no knowledge of the applications alleged to have been made by the complainants to the said *C. D.*, for a conveyance of said property, and a payment of the rents and profits thereof, but are aware that on or about the 30th day of January 1834, *U. S. Heath, Esquire*, on the part of the complainants, addressed to the said *C. D.* a note, now herewith produced, marked A, and which they pray may be regarded as a part of this their answer, to which the said *C.* returned the answer now likewise produced, herewith marked B, which they pray may be also regarded as a part of this their answer; and they further insist upon *the lapse of time and the statute of limitations* as a defence to the pretended claims and demands set up by the complainants in their said bill. These respondents are not aware, nor do they believe that *C. D.* kept books of any kind, in which charges are made against his daughters, *Abigail* and *Margaret*, not having found in any of the books of the de-

ceased, accounts opened or against the said *A.* and *M.*, but this respondent, *M.*, who as executrix, is in possession of the books of the deceased, is prepared to produce.

The exhibits filed with the bill, showed, that on the 30th January 1834, the complainants sought of *Cumberland Dugan* an amicable settlement of their rights, which he declined; denying their right to any part of the property claimed by them.

After the filing of answers, much proof was taken, and a variety of deeds, records, and other documents, were also produced in evidence; all of which are sufficiently stated in the preceding bill and answer, and in the opinion of this court.

On the 4th March 1841, *Baltimore* county court, (R. B. MAGRUDER, A. J.) decreed, that the complainants are entitled to a specific performance of the contract, entered into by *Cumberland Dugan*, with his daughter, *Margaret Dugan;* and that the defendants, the devisees of the property in question, to wit: *C. D. Hollins,* infant son of *Rebecca Hollins; C. D. Hollins,* infant son of *Cordelia M. Hollins; J. S. Smith; John S. Hollins,* and *Rebecca,* his wife; *R. S. Hollins,* and *Cordelia,* his wife; by a good and sufficient deed, convey to the female complainants, in *fee simple,* the house and lot, &c.; a trustee was appointed, to convey for the infants.

And that *Margaret Dugan,* one of the defendants, widow of the said *C. D.,* account with for, and pay over to the complainants, the rents and profits of the said property, so decreed to be conveyed, so far as she may have received the same, from the time of the death of the said *C. D.,* to the present time, with interest; that *J. S. Smith,* the trustee of *R. H.,* also account and pay over rents which he has, or had in his hands when he became a party to this suit. The decree then directed an audit and account. Payment, also, by the present tenants, of what they still owed, and also an account with *M. D.* as executrix of *C. D.,* from death of *W. R. Smith* to death of *C. D.,* with liberty to take further proof, and a reservation to the infant defendants to shew cause, after arrival at age, within, &c.; and for costs against *M. D.*

The judge assigned as reasons for the decree:

1st. The proof is clear, unequivocal, and uncontradicted, that *Cumberland Dugan* intended to give, and did give to his daughter *Margaret* the house and lot in *Cumberland Row*, described in the proceedings of this cause, in contemplation of marriage, and as a marriage portion for his said daughter.

2nd. That he put her in possession of the said house and lot before the marriage, and that the marriage actually took place in said house, and that she and her husband occupied the said house and lot until the spring of 1799, and that afterwards her father, from time to time, for many years, paid her the rents of the said house, and treated, and declared, and considered the house as her property.

3rd. That he never set up any right or title to the house, but on the contrary, a short time before *Mrs. Smith's* death, withheld the payment of the rents, upon the ground that he had a claim against the husband of his said daughter, a reason and ground entirely consistent with, and in affirmance of, the fact of a gift to his daughter, as an advancement and marriage portion.

4th. That although the said agreement was not in writing, yet the above facts demonstrate such a part execution of the contract as takes the case out of the statute of frauds, because the putting in possession, the payment of rents, and the withholding, for a short period before his daughter's death, the rents for the reason assigned by *Dugan*, are all facts, taken together, which would not have been done unless on account of the agreement.

5th. That not to decree a performance, and to permit the statute of frauds to operate, would enable *Dugan* to perpetrate a gross fraud upon the marriage parties.

6th. That the payment of rents by *Dugan* to his daughter, *Mrs. Smith*, for so long a time after her removal from the house in question, to the *Rope Walk*, forbids all idea of any substituted gift of another house in lieu of the one originally given.

7th. That there is no evidence to show, that the *Rope Walk* property was a gift by *Dugan* to *Mrs. Smith*, his daughter, in substitution of the house and lot in *Cumberland Row*. The

exception taken by the complainants' counsel, and filed among the proceedings, to that portion of *Mrs. Bosley's* answer to the third cross-interrogatory, which states, that *Mr. Cumberland Dugan* gave a deed of the *Rope Walk* property to his daughter, *Mrs. Smith*, being sustained by the court, that portion of her testimony being clearly inadmissible.

8th. That there is nothing in the circumstances of this case to show, that the claims are of so stale a nature, or that there has been such laches on the part of the complainants in not sooner bringing their suit, as that it ought not to be, at this late period, heard in a court of equity, nor ought the statute of limitations to be a bar. The relations between *Dugan* and his son-in-law, *Wm. R. Smith*, the father of the female complainants, would, in my judgment, prevent any charge of laches up to the death of *Smith*, even if a legal representative of *Smith* were here claiming, and at that period some of the children were of tender years, and all of them were under twenty-one; *Eleanor*, one of the female complainants, was but a few months above the age of twenty-one when she married, and she is covert, still her husband being alive; and one of the complainants, *Rebecca*, the other female complainant, was married under twenty-one years, being only about eighteen years, and at the time of the bringing of this suit her husband, *James C. Gittings*, was alive, and united with her as a com-complainant; laches in bringing forward this claim at so late a period, does not apply to a case like this, which may be regarded as one between parent and child, and should be looked at in that view by the judicial eye. To such a case, laches does not apply. 3 *Dessauss.*, 517, 519. *Caborne vs. Godfrey.*

9th. The reason for taxing the costs to the defendant, *Margaret Dugan*, as executrix of *C. Dugan*, is that the trustee for the infant defendants, and the other defendant's rights not to be burdened with costs, if no injustice be thereby done to other persons, and as the whole controversy was with the testator, *C. Dugan*, commencing with his refusal in his lifetime to recognise the rights of the complainants, and continued by a devise of the property under his will, and the defence of this

suit having been made in affirmance of his acts and intentions, the costs ought, perhaps, properly to fall upon his estate.

The auditor of the court reported several accounts:

Account A.—Charged two-thirds of the rents, from 10th Dec. 1818, the time of the death of *W. R. S.*, with interest to the 10th Dec. 1841. The interest was charged upon each year's rent as it fell due, and the account amounted to $10,870.81.

The auditor reported that he only allowed two-thirds of the rents, because the personal representatives of *John Smith*, the deceased brother of *Rebecca* and *Eleanor*, were not before the court.

He also reported, that the sum of $3601.12, for rents due since the death of *Mr. Dugan* to 12th Oct. 1840, with like interest as in the preceding item. Other accounts were stated, and various exceptions taken to them. The county court affirmed account A, and awarded payment by *Margaret Dugan*, as executrix of *C. D.*, to each of the daughters of *Mr. Smith*, one-half of the sum of $10,870.81, with interest from 10th Dec. 1841, from which decree the defendants appealed to this court.

The appeal on behalf of the infant children of *Rebecca* and *Cordelia Hollins*, represented by *John Spear Smith*, was dismissed.

The cause was argued before DORSEY, SPENCE and MARTIN, Judges.

By JOHN NELSON and REVERDY JOHNSON for the appellants, and

By McMAHON and GLENN for the appellees.

MARTIN, J., delivered the opinion of this court.

It appears from the record in this case, that the original decree was passed by *Baltimore* county court, as a court of equity, on the 24th of March 1841. The final decree ratifying and confirming the auditor's report, was pronounced on the 25th of March 1843. An appeal was taken on the part of all of the defendants from this decree, on the 10th of October of the same year, but the appeal which was entered by the infant

defendants having been dismissed, the case is presented upon the appeal alone of *Mrs. Margaret Dugan, John Smith Hollins and wife,* and *Robert S. Hollins and wife.*

In this condition of the case, the counsel for the appellees have contended, that the decree of the 24th of March 1841, not having been appealed from within the period prescribed by the act of 1785, ch. 72, is not now open for objection in this court; that the decree is conclusive as to the matters settled by it, and it must be regarded as establishing the appellee's right to the property decreed to be conveyed; and also to an account of the rents and profits thereof, from the death of *William R. Smith,* leaving open only the questions, as to the proper statement and adjustment of that account. The proposition stated by the counsel for the appellees is, that as the decree of the 24th of March 1841, was one from which the appellants had the right to appeal, they were obliged to exercise the privilege, upon the authority of the case of *Strike against McDonald,* 2 *H. & G.,* 260; and having failed to do so in due time, the matters adjudicated by that decree, are to be regarded as conclusively established, and not now open for objection or examination in this court.

By an Act of Assembly of 1830, ch. 185, sec. 1, it is provided, "that no appeal shall hereafter be allowed from any decree or order of the chancery court, or county court, sitting as a court of equity, unless it be a final decree, or order in the nature of a final decree; and that upon appeal from a final decree or order, in the nature of a final decree, within the time limited by law for such appeals, all previous orders and decrees passed in the cause, shall be open in the appellate court, in the same manner as if such previous orders or decrees had been as heretofore appealed from, within nine months from the time of the passing of the same." These are the provisions of the act of 1830, and it is clear, that if that clause of the first section, which declares, that upon an appeal from a final decree, all previous orders and decrees passed in the cause, shall be open in the appellate court, is still in force, the right to inquire into the correctness of the decree of 1841, belongs to the appellate court, for it has been conferred by the express terms of the

statute. The language of the act has been made so compre-hensive, as to embrace *all* orders or decrees, whether they are matured decrees, professing to establish all the rights in contro-versy between the parties, as in the case of *Strike against McDonald*, 2 *H & G.*, 260, or mere interlocutory and pre-paratory orders, as in the case of *Snowden against Dorsey*, 6 *H. & J.*, 114. If the order or decree in dispute, was passed in the cause, and was previous to the final decree, it becomes open for revision in the appellate court, by force of the very words of the statute. The only question, therefore, that can arise on this branch of the case is, whether this clause of the first section of the act of 1830, has been repealed by the act of 1841, ch. 11?

By the first section of that act, it is declared, "that so much of the first section of the act of 1830, ch. 185, as takes away the immediate right of appeal from any decree or order of the court of chancery, or any county court, for the sale, convey-ance or delivery of real or personal property, be, and the same is hereby repealed; and that from any such decree or order heretofore, or hereafter to be passed, the right of an immediate appeal *is hereby given;*" and we are satisfied, that although the legislature have directly repealed that branch of the first section of the act of 1830, which denied to the defendant the privilege of appealing from any decree which was *not final in its* character, and restored to him the right of an immediate appeal, from the particular decrees enumerated in its first sec-tion, they have left *in force* that part of the section which de-clares, that on an appeal from a final decree, all previous orders shall be open in the appellate court, in the same manner as if such orders had been, as heretofore, appealed from.

It is perfectly obvious, from an inspection of the act of 1841, that the legislature did not contemplate a total repeal of the act of 1830. To what part then of the act of 1830, did they pro-pose to apply the repealing power? An answer to the question is to be found in the words of the first section, which declare, that *so much* of the antecedent act as takes away the immedi-ate right of appeal from any decree of the court of chancery, for the sale, conveyance, or delivery of real or personal pro-

perty, is repealed; and it is manifest, that the object was to repeal only that portion of the former act, which had abridged the right of appeal.   The Court of Appeals had decided, in the December term 1840, in the case of *Lee against Pindall*, 11 *G. &. J.*, 364, that the object of praying an appeal, and filing an appeal bond, under the *proviso* contained in the first section of the act of 1830, was not to effect an immediate removal of the cause to the Court of Appeals, but that it merely suspended the execution of the decree, for the sale or delivery of the specific property, until a final decree was passed, when the whole case might be brought up for review in the appellate court; and the legislature, believing that a party ought to possess the right of appealing immediately from decrees of this nature, repealed, in this respect, the act of 1830, without, however, imposing on the defendant the obligation of appealing from such decree, or depriving him of the right of having it reviewed in the appellate court, on an appeal from the final decree, as secured to him by one of the provisions in the former act.

There is, we think, no ground for contending, that the provision in the act of 1830, under which the appellants have claimed the right to subject to the review of this court, the decree of the 24th of March 1841, has been repealed, either directly or by implication.   These two statutes being in *pari materia*, are to be construed together.   A latter statute on a given subject, not repealing an earlier one, in terms, is not to be taken as a repeal by implication, unless it is plainly repugnant to the former, or unless it fully embraces the whole subject matter.   20 *Pick.*, 410.   21 *Pick.*, 297.   9 *Cow.*, 437.   5 *Hill*, 221.   11 *Coke*, 63.   *Dwar. on St.*, 675.

Having disposed of this preliminary point, and considering the whole case as properly before us, we proceed to an examination of the grounds, on which the appellants claim a reversal of the decree, pronounced by the county court.

The first point made in the cause, and that which was pressed with most emphasis, is, that the appellees have entirely failed to establish by evidence, the existence of any such contract or gift, as is charged in the bill, and that *Cumberland Dugan*

never gave or promised to give, the property mentioned in the bill, to the mother of the appellees, as a marriage endowment.

The bill alleges, that the late *Mr.* and *Mrs. Smith* were married in the month of October 1798. That the alliance was contracted with the knowledge and the approbation of *Mr. Cumberland Dugan,* the father of *Mrs. Smith.* That *Mr. Dugan* was also the father of *Mrs. Purviance,* and that after she had become engaged, he, in the autumn of the same year, gave to her as a marriage portion, the house in which the *Judge* and *Mrs. Purviance* now reside. That he was at this time a man of ample fortune. That having advanced one daughter, and the other being at the time addressed, with his approbation, *Mr. Dugan* deemed it proper and just, to make a similar provision for his daughter, *Margaret,* by way of advancement, and in contemplation of her marriage with *Mr. Smith.* That accordingly, a short time before the marriage of *Mrs. Smith,* he announced his determination to give to her the house in *Cumberland Row,* (the subject of the present controversy,) and that he in fact, did give to her, in fee, the house in question, a short time before the celebration of the marriage, as a marriage portion. That this establishment was prepared for the reception of his daughter, and she was placed in possession of it, by *Mr. Dugan,* as her own property. That these arrangements were known to the husband. That their nuptials were celebrated there. That they continued to reside in this house until the spring of 1799, and from that period to the time of the death of *Mrs. Smith,* she was in the enjoyment under the gift, of the rents arising from this property, with the knowledge and consent of her father, and that the rents were sometimes paid to her, either by *Mr. Dugan* or his agent.

The object of the bill is two-fold. First, to procure a conveyance of the house and lot in controversy, to the complainants, from the devisees of *Cumberland Dugan;* and as consequent upon the assertion of a title to the property, an account and payment of the rents received by *Mr. Dugan.*

These are the material statements and allegations of the bill, and we are satisfied that they have been fully established by the testimony in the cause.

The delivery of the possession of this house to *Mrs. Smith,* prior to her marriage, as her own property under the gift. The fact that she resided there with her husband until the spring of 1799, and then removed, only that *Mr. Smith* might prosecute with more convenience, the affairs of a partnership, which had been concerted by *Mr. Dugan,* between *Mr. Smith* and the brother of *Mrs. Smith,* in the business of the *Rope Walk.* The payment of the rents issuing from this property by *Mr. Dugan,* or his agent, until within a few months before the death of *Mrs. Smith,* and then withheld that they might be applied by *Mr. Dugan* to the discharge of some responsibility in which he had become implicated for *Smith.* The declarations of *Dugan,* before the marriage, and after it had been solemnised, that he intended to give, and had given this property to his daughter as a marriage advancement or portion, and his declaration after the death of his daughter, "that it was her property, and should go to her children," constitute a mass of proof upon the *factum* of the gift, which it is impossible to resist.

It is true that a mere verbal, voluntary, executory agreement, although founded on the meritorious consideration of love and affection, cannot be enforced by a court of equity, and the party who made it may, at his will, violate or abandon it. In *Pennington vs. Gittings,* 2 *G. & J.,* 217, this court said: "The consideration of natural love and affection is sufficient in a deed, but a mere executory contract that requires a consideration, cannot be supported on a consideration of blood, or natural love and affection; there must be something more, a valuable consideration, or it is not good, and cannot be enforced at law, but may be broken at the will of the party. And being void at law for want of a sufficient consideration, chancery cannot sustain and enforce it." 2 *Story's Com. Eq., Sec.* 987.

But this is not the character of the contract now under examination. Having been made in contemplation of, and as a marriage endowment, it has for its support a valuable consideration. It cannot be revoked or violated at the will of the party who made it. The marriage was a consideration which vested the interest in the donee against all the world; she is to be re-

garded as a purchaser, and as much so as if she had paid for the property an adequate pecuniary consideration, 1 *Jno. Ch. Rep.*, 271. It cannot be necessary to cite authorities to maintain the proposition, that marriage is to be regarded as a valuable consideration. In *Buchanan vs. Deshon*, 1 *H. & G.*, 192, the Court of Appeals, in speaking of a marriage contract, say, that it was founded upon a consideration which was valuable, and one upon which the law looks with a favorable eye. The same doctrine is announced by the Supreme Court in the case of *Magrew vs. Thompson*, 7 *Pet.*, 333. The late *Mr. Justice Story*, stating in the opinion of the court, delivered by him, "that marriage, in contemplation of the law, is not only a valuable consideration, but is a consideration of the highest value, and from motives of the soundest policy is upheld with a steady resolution."

We are, also, very clearly of opinion, that the delivery of this property by *Mr. Dugan* to his daughter, in pursuance of the gift, and the fulfilment of the condition on which it was to attach, by the consummation of the marriage, extracted this contract from the reach of the statute of frauds. The consummation of the marriage, in a case like this, is to be considered as equivalent to the payment of the purchase money in a pecuniary contract, in both cases the consideration is discharged. There is to be found then, in this case two ingredients, which when combined, have always been regarded as relieving the parol agreement from the operation of the statute,—performance of the consideration, and a change of possession under the contract. *Drury vs. Conner*, 6 *H. & J.* 292  2 *Stor. Com.*, *Sec.* 763. 1 *Sug. V.*, 143. 18 *Ves.*, 328.

Before we leave this branch of the case it is proper to state, that we do not consider the answer of *Mrs. Margaret Dugan* as within the general rule, that an answer asserting a fact responsive to the bill can only be disproved by two witnesses, or one witness with strong corroborating circumstances. The doctrine on this subject is stated with great perspicuity and precision by the late chief justice of this court, in the case of *Pennington vs. Gittings*, 2 *G. & J.*, 215, and is directly applicable to the question before us. He says:—"A plaintiff, by calling on the

defendant to answer the allegations in his bill, upon oath, makes the answer evidence; and as one witness would only be equivalent to the answer, and the plaintiff to prevail, must have preponderating proof, it is necessary that he should have another witness, or circumstances in addition to the testimony of one, in order to turn the scale.   But looking to the answer as testimony only, it must be treated as any other testimony, and the weight of it must, from the very nature of evidence, in some degree depend on the fact it asserts.   Therefore, when an executor or administrator answering in his representative character, alleges facts of which he can have no personal knowledge, it can but amount to an assertion of his impressions, and his speaking positively cannot alter the character of his testimony, merely because it comes in the shape of an answer, but must be allowed its due weight only, and is not entitled to the full influence of the answer of a man, speaking of facts which may be within his own knowledge.   And upon the obvious principle, that when a witness asserts a fact, of which further developments in the course of his examination prove him to be in a situation to prevent his having a full knowledge of the subject, his testimony is not entitled to the weight of that of a man swearing to facts which may be fully within his knowledge. The answer in this case is of that description, and is not, we think, such as to require the testimony of two witnesses, or one with circumstances to out weigh it.   But as it does not admit the allegations in the bill, it puts the complainant on proof, and leaves him to sustain them as he can, unembarrassed by any supposed responsive features of the answer." 9 *Cran. R.* 160. The principle which withholds from an answer of this description, the weight to which it would be entitled, if it came from the party to the transaction, cannot be changed by the period at which the complainant may have filed his bill, no matter by what motives he was influenced in postponing the institution of his suit, because the answer being in its nature testimony only, the influence to be attached to it must always depend on the fact it asserts, and the position of the party who makes the assertion.

Assuming that the gift claimed by the appellees was originally made, and so made and executed as to have been valid in law against the donor or settlor, we do not think that the proof in the cause shews, as has been maintained by the counsel for the appellants, the substitution of another property, (described as the *Rope Walk,*) in place of the house in contest, by the consent of all parties concerned, even if the appellants could avail themselves of this ground of defence under the pleadings in the cause.

*Mrs. Smith* died in 1806. The deed from *George Dugan* to *Judge Purviance,* as her trustee, conveying the property described as the *Rope Walk,* was executed on the 1st of June 1803. And yet we find *Cumberland Dugan* paying to his daughter the rents of the property in *Cumberland Row,* to within a few months of her death, and after her demise affirming that the house belonged to her, and should go to her children. These facts are entirely inconsistent with the idea, that there was, with the consent and understanding of all parties, a substituted gift of another property for that which was originally given.

It appears, also, that so far from the independent matter thus relied on, having been advanced by the answer as a ground of defence, the argument presupposes the existence of an agreement and gift, which the answer directly repels, and it may perhaps be doubted, upon the case of *Boon vs. Chiles,* 10 *Pet.,* 209, whether it would have been competent for the appellants to have availed themselves of this defence, under the pleadings in the cause. We do not mean, however, to determine this question, and overrule this objection to the decree, on the ground that there is no evidence to support it.

The propositions which we propose next to examine, are those presented by the pleas of the statute of limitations and lapse of time. This defence has been taken by the answer, and the enquiry is, has it been sustained?

It is clear, that *William R. Smith* was entitled to a life estate, as tenant by the curtesy, in this equitable inheritance of his wife. 1 *Rop.,* 19. 5 *Mad. R.,* 249. And the principle is now established by the case of *Morgan against Morgan,* 5

*Mad. R.*, 248, that the husband is tenant, by the curtesy, of the equitable inheritance of his wife, notwithstanding a direction to pay the rents and profits to her separate use, during the coverture; the receipt of the rents and profits being a sufficient seisin in the wife. The Vice Chancellor adopted the opinion of *Lord Hardwicke,* in *Roberts against Dixwell,* 1 *Atk.* 603, as containing the true doctrine on this subject.

The interest of *William R. Smith,* in this estate, passed to *Cumberland Dugan,* as his assignee, by force of the deed of the 13th of August 1801, and *Dugan* must be regarded as occupying the property, in this character, until the death of *Smith,* in 1818. It is manifest, therefore, that no cause of action had accrued to the appellees, in respect to this estate, until 1818, when their father died. At this period, then, for the first time, the statute of limitations was put in motion by the adverse claim of *Dugan.*

It appears that one of the appellees, *Mrs. Eleanor Gittings,* was of age in July 1820, and married in the spring or winter of 1821; and that *Mrs. Rebecca Gittings* attained the age of twenty-one years in 1825, and was married in 1822. And notwithstanding, in the case of *Mrs. Rebecca Gittings,* there was *coverture* before the termination of her infancy, it was not competent for her to avail herself of any other disability than that of *infancy:* the disability that existed at the time her cause of action accrued. The doctrine upon this subject, was correctly stated by the counsel for the appellants, and not disputed by their opponents. The rule is this: a party is protected by the disability that exists at the time his right of action first accrued, because the case is within the express terms of the saving clause in the statute. For the same reason, if there are in existence several disabilities, at the time the right of action accrues, the statute does not begin to run until the party has survived them all. But it is now firmly established, that you cannot prevent the operation of the statute by cumulative disabilities. 3 *J. Ch. R.,* 138. 4 *Mass. R.,* 182. 7 *Serg. and R.,* 210. *Mercer vs. Selden,* 1 *How.,* 52. The whole doctrine was examined with elaborate care by Chancellor *Kent,* in the case of *Demarest against Winkoop,* 3 *J. Ch. R.,*

138, and the opinion pronounced by him, has been received as containing the correct rule upon the subject. If subsequent disabilities were to be regarded, the right of action might be saved for centuries; and the statute would be rendered incapable of accomplishing the important purposes for which it was passed.

The bill was filed on the 3rd of January 1837, and as between that period and 1818, when the right of action accrued, twenty years had not elapsed, a right of entry in the plaintiffs would not have been tolled, had they been clothed with the legal title, and a court of equity, in applying the statute of limitations analogically, would not permit the claim of a party to be affected by any devolution of time, short of that which would have barred them at law, in an action of ejectment. *10 Wheat.,* 152. We think, therefore, the appellee's claim to the property is not barred, either by limitations or lapse of time.

It has, however, been contended by the counsel for the appellants, that although the appellees are not barred, so far as their claim for the property is concerned, yet they are barred by limitations and lapse of time, from recovering any rents, except such as were received by *Mr. Dugan,* within three years before the filing of the bill. The ground upon which this argument has been placed is, that it would have been competent for the plaintiffs, on the case made in their bill, to have recovered the rents from *Dugan,* in an action of *indebitatus assumpsit,* and it was a case, therefore, of concurrent jurisdiction, between the courts of equity and law.

It is true, that the statute of limitations, in all cases of concurrent jurisdiction at law and in equity, is equally obligatory in each court. In such cases, courts of equity do not act so much in analogy to the statute, as in obedience to it. They apply the statute as it would have been applied at law. In *Murray against Coster,* 20 *J. R.,* 583, *Chief Justice Spencer* said:

"All, however, I mean to deduce from this consideration is, that it is impossible in a case like this, where there was ample remedy at law, that the change of the *forum* should produce a

21 v.3

change in the rights of the parties; for beyond all doubt, had the respondents sued at law, the appellants could have pleaded the statute; whether successfully or not, remains to be considered. I have, therefore, no hesitation in saying, that in a case where there is a concurrent jurisdiction in the courts of common law and of equity, the rule must be the same, and the statute of limitations may be pleaded with the same effect in the one court, as the other.''

The same doctrine is announced by Chancellor *Kent*, in 7 *J. C. R.*, 124, *Kane vs. Bloodgood*, where he says:—

''I understand this proposition to mean, that if the party has a legal title, and a legal right of action, and instead of proceeding at law, resorts to equity; instead of bringing his action of account, or detinue or case for money had and received at law, files his bill for an account, the same period of time that would bar him at law, will bar him in equity. This is the principle that pervades the cases.'' 2 *Sh. and Lef.*, 607.

This being the principle by which courts of equity are governed, in the application of the statute of limitations, if the counsel for the appellants could have maintained the proposition, that the appellees had a remedy at law for the recovery of the rents, the statute would have operated as a positive bar.

But it is clear, we think, that the rents and profits of this property could not have been recovered at law, by the appellees, either in *indebitatus assumpsit*, or any other form of action. .

It is evident, that in a case like this, the right to the rents would be consequent only upon the successful assertion of title to the property, and as this contract, resting in parol, would have been absolutely void at law, no recovery in that court could have been obtained. The doctrine of part performance is peculiar to the chancery courts, and is not regarded at law as taking a case out the statute of frauds. *Jackson vs. Pierce*, 2 *J. Rep.*, 222.

Another insuperable objection to the maintenance of an action at law, would have been, that in that court the plaintiffs could not have stood upon their equitable title.

In *Mathews vs. Ward*, 10 *G. & J.*, 456, the Court of Appeals declared, that the doctrine of *Lord Mansfield*, in

3 *Bur.*, 1901, has been receded from, and that it had been repeatedly decided, that the legal estate shall prevail against the equitable title. In *Doe vs. Wroot*, 5 *East*, 138, *Lord Ellenborough* says: "We can only look at the legal estate; if the devisees have an equitable interest, they must claim it elsewhere, and not in a court of law." 7 *East.*, 22. 2 *John. Rep.*, 226.

In *Welsh vs. Welsh*, 5 *Ohio R.*, 430, it is said: "Does it follow that because the plaintiffs have an equitable claim against the defendant, he can enforce this claim if he sues in *assumpsit*. If he prosecutes his suit in a court of law, he must in *assumpsit*, as well as in any other form of action, show that he has a legal right of action. When this is shown, the action will be governed by equitable circumstances."

The same proposition is established in *Kane against Bloodgood*, and would have been held by a court of law, as fatal to the recovery of the plaintiffs. Chancellor *Kent*, in speaking of the case of *Lawly against Lawly*, 9 *Mod. R.*, 32, says: "In this case, lands were settled, by will, on trustees; and one of the trusts was, that if the son's wife survived, she was to receive the rents and profits of the land, as the same were at that time let. Her husband, afterwards, greatly increased the rent, and upon his death, his wife enjoyed the whole of the rents, making no distinction between the original and the additional rent. A number of years after her death, her executor was sued by the devisee in tail, being a grandson of the testator, for an account of the surplus rents received by her, and by her executor. The plea of the statute of limitations was overruled, because the estate in law was in trustees, and the executor was decreed to account for the improved rents received by her, or by him, since her death."

There is no reason given, the Chancellor says, for this decree, but what is to be inferred from the single observation, *that the estate in law was in trustees*, and that must be understood to mean, that the plaintiff in the bill had not the legal title, and could not have maintained an action at law. Again, he says: "It was a suit by one *cestui que trust* against the representative of another *cestui que trust*, for receiving more of the rents than belonged to her; and I can see no reason why, as between

them, the statute could not have been applied, unless we adopt the plain rule, upon which alone the decision is intelligible and just, that the plaintiff was a *cestui que trust, without any title or remedy at law.*" 7 *J. Ch. Rep.*, 115. Without pursuing this subject further, or adverting to other objections that might have been raised against a recovery at law, we think that the only remedy open to the appellees is, that which they have adopted, the assertion of their title to the property in a court of equity, and as consequent upon that title, an account and payment of the rents and profits. In our opinion, therefore, the court below committed no error in overruling the plea of the statute of limitations.

It is scarcely necessary to add, that we do not adopt the proposition supposed to have fallen from the learned Chancellor, in the case of *Caborne vs. Godfrey, 3 Dessaus.* 517, that in controversies between parties standing in the relation of parent and child, "the statute of limitations does not apply, and time is unimportant," for the plain reason, that the court have no power to interpolate into the statute new exceptions and provisions. But we place our opinion on the ground, that as the bill was instituted by the appellees, within less than twenty years from the period at which their right of action accrued; and as their claim for an account and payment of the rents was incidental to, and consequent upon their assertion of title to the property, they are not barred by either limitations or laches.

We think, however, that the decree of the county court was erroneous on the question of assets.

In *Evans vs. Iglehart*, 6 *G. & J.*, 197, this court said, "the rule upon the subject of assets is different in the court of equity from what it is at law. Where you seek to charge an executor or administrator, in his representative character, before the latter tribunal, assets are presumed, unless as a fact it is put in issue by the pleadings, but before the former tribunal, assets in his hands, must be alleged, and if denied or not admitted, must be proved." In *Warfield vs. Gambrill*, 1 *G. & J.*, 511, it was decided, "that a respondent submitting to answer must answer fully, but if the answer be defective, and insufficient to meet the allegations and interrogatories of the bill, the complainant,

desiring a further response, must except to the answer. If he do not, he cannot rely on the silence of the respondent in relation to any material allegation, but must prove it." And in *Young vs. Grundy*, 6 *Cran.*, 51, the Supreme Court say, "that if the answer neither admits nor denies the allegations of the bill, they must be proved upon the final hearing."

*Mrs. Dugan* states, in her answer, that she has received, as the executrix of *Cumberland Dugan*, the assets shewn by her return to the *Orphans* court, which she is prepared, when required, to produce. Surely this cannot be regarded as an admission of the sufficiency of assets, unless upon the principle asserted in *Smith vs. Smith*, 4 *Paige*, 272, "that as the executrix does not in her answer state that there is any deficiency of assets, the court must presume there is sufficient for the purposes of the suit." A proposition directly in conflict with the decisions, both of this and the Supreme Court.

The decree below, in this respect, was clearly erroneous, and as the objection is directed not against any vice or infirmity in the bill, or to the competency of witnesses, or to the admissibility of testimony, but because the complainants failed to establish, by proof, a material allegation in their bill, the appellants are not precluded, by the act of 1832, ch. 302, from raising it in this court. 7 *G. & J.*, 155.

It appearing to us that the substantial merits of the case will not be determined by affirming or reversing the decree of the county court, and that the purposes of justice will be advanced by permitting further proceedings therein, and further testimony to be taken in relation to assets, in pursuance of the 6th section of the act of December session 1832, ch. 302, the cause will be remanded to *Baltimore* county court, as a court of equity.

CAUSE REMANDED.