NELSON (A FREEDMAN) *vs.* THE STATE.

[INDICTMENT AGAINST SLAVE FOR THE MURDER OF SLAVE.]

1. *Liability of freedman to conviction and punishment for offense committed while slave.*—For the murder of a slave by a slave, while the institution of slavery existed here, there has been no law in force in this State since the 22d September, 1865, under which the slayer can be convicted and punished. (BYRD, J., *dissenting.*)

FROM the Circuit Court of Montgomery.

Tried before the Hon. F. BUGBEE.

THE indictment in this case, which was found on the 2d December, 1865, charged that, before the finding thereof, "Nelson, *alias* Nelson Johnson, now a freedman, but formerly a slave, the property of T. B. Bethea, unlawfully, and with malice aforethought, did, while he was a slave as aforesaid, kill Annice, *alias* Annice Bethea, a female slave, the property of T. B. Bethea, by strangling or choking her with a string, cord, rope, or suspender, or by throwing her into a well; against the peace and dignity," &c. The trial was had on the 20th December, 1865. The prisoner demurred to the indictment, but his demurrer was overruled; and he then pleaded not guilty. The evidence adduced on the trial, as the bill of exceptions states, proved that the deceased was murdered in February, 1865; that she and the prisoner were at that time slaves, and belonged to T. B. Bethea; and there was circumstantial evidence which tended to show that the crime was committed by the prisoner. The prisoner asked the court to instruct the jury, "that if they found, from the evidence, that the deceased was a slave at the commission of the offense, and that the defendant was a slave at that time, then the defendant cannot be convicted and punished under this indictment." The court refused to give the charge, and the defendant excepted to its refusal. The jury, by their verdict, found the defendant "guilty of murder in the first degree," and

sentenced him to death; and judgment was rendered accordingly.

WATTS & TROY, for the prisoner.

JNO. W. A. SANFORD, Attorney-General, *contra*.

BYRD, J.—This is an indictment against the prisoner for the murder of Annice, "*alias* Annice Bethea, a female slave, by strangling or choking her with a string, cord, rope, or suspender, or by throwing her into a well." The record shows that the offense was committed in February, 1865, and that the prisoner and the deceased were both slaves at that time.

The only distinction between this case, and the cases of *George (a freedman) v. The State*, and *Burt (a freedman) v. The State*, is, that the offenses in those cases were committe.¹ against white persons, and in this case the slayer and the ᵔᵔ ᵔin were slaves, and equals in *status*.

The jury find, by their verdict, that the prisoner was guilty of murder in the first degree. This is one of the highest crimes known to the law, and section 3312 punishes it with death, and so did the common law. Murder is the same offense by the Code, as at common law. Murder may be accurately defined to be "a homicide, by an act committed from a depraved mind fully bent on evil, the result of which is the death of a human being within a year and a day from the time of its commission;" or, in other words, it is the killing of one human being by another, with malice aforethought, express or implied. The Code does not define the crime of murder: we have to look to the common law alone for its definition. It must, therefore, mean the same thing in the Code that it does at common law. The language of the Code is, "Every slave, who is guilty of murder, must, on conviction, suffer death." It does not provide that one slave may commit murder upon another; but this was so at common law, and resulted from the very definition of the crime. The offense, then, of one slave killing another with malice aforethought, is murder at common law; and there is no such offense by statute, for the Code adopts as to the slave the common-law offense; and as to the punishment,

the Code also adopts the common-law punishment of death.

Now, in this case, there is no diversity of *status* of the slayer and the slain, to make it even plausible to hold that the change of the *status* of the slayer should relieve him from the punishment affixed by statute and common law, or to hold that the *status* is so far of the essence of the crime and the punishment, when he kills a person of another and a higher *status*, as to relieve him from the latter. Here, both were slaves and human beings; and the offense and the punishment being the same at common law and by the Code, and the *status* of the slayer and the slain being the same, I am of opinion, that the prisoner is liable to be punished for the offense, and that such punishment can be inflicted upon a conviction under a common-law indictment, by averring that the prisoner, "then and there being a slave, feloniously did kill Annice, a slave," &c., setting out the specific offense according to the common law.

The punishment prescribed by sections 3080, 3081, and 3082 of the Code, were positively prohibited by section 3305 from being inflicted on slaves, at the time this offense was committed. Therefore, those sections cannot be applied to offenses committed by slaves; and if a slave was indicted at common law for an offense, and found guilty, the common-law punishment alone could be inflicted. For how could that punishment, which was prohibited by law from being applicable to slaves, for offenses committed while slaves, ever be made applicable to them when they became free, except for offenses committed by them after they became free. Such application would be in violation of section 3305 of the Code, and also *ex post facto; if not in* mitigation. But the prohibition of section 3305 of the Code is explicit, and forever forbids the infliction of the punishment prescribed by sections 3080, 3081, and 3082, at the time the offense was committed; and the common-law punishment being the only one then in force, it must be inflicted, or none. Even the repeal of section 3305, before the trial, but after the offense, would not make sections 3080, 3081, and 3082 applicable; because section 3305 was prohibitory at the time of the offense committed. But the

offense and the punishment being the same at common law
and by section 3312 of the Code, the common-law punish-
ment could be inflicted.—See 1 Bish. Crim. Law, from
§ 90 to § 108, inclusive. Therefore, the fact that slavery
has been abolished, and thereby said sections are made
applicable to freedmen, for offenses committed by them as
freedmen, does not relieve them from the punishment pre-
scribed for offenses committed by them while slaves.

But suppose the above is not correct; yet, sections 3080,
3081, and 3082 are in mitigation of the common-law pen-
alty; and the court below seems to have been of opinion
that those punishments could be inflicted, because death
was one, and penitentiary confinement the other, and that
that was in mitigation of the punishment under section
3312 of the Code; and being so, the jury could inflict
either, under a familiar principle of the common law, that
where the statute mitigates a common-law or statutory
punishment, the mitigated punishment could be inflicted,
where the offense was committed before the passage of the
statute, and it was a common-law offense; and there are
authorities directly to the point. If the punishment is mit-
igated, it is held not to be *ex post facto.*—1 Bish. C. L., § 108;
Story on Const. § 1345; *Commonwealth v. Mott,* 21 Pick. 472,
501; *Strong v. The State,* 1 Black. 193; *The State v. Wil-
liams,* 2 Rich. 418; *Clarke v. The State,* 23 Miss. 261; *Daw-
son v. The State,* 6 Texas, 347. So that, whether the com-
mon-law punishment could be inflicted or not, it appears
that if the abolition of slavery made sections 3080, 3081
and 3082 a change of punishment, which is applicable to
offenses committed by freedmen who were slaves when the
offenses were committed; yet this punishment, being in
mitigation, and not in aggravation, can be inflicted where
the offense has not been repealed. The abolition of slavery
certainly does not operate a repeal of the offense of mur-
der, even to the extent of relieving a slave from punish-
ment for an offense committed while a slave. Repeals by
implication are not favored in law; and yet, in this case,
the repeal is implied, not from a repugnant statute, but from
a change of *status.*—13 Pick. 343, 348; 2 *ib.* 172; 24 *ib.*
296; 20 *ib.* 409; 5 Hill, (N. Y.) 221; *Wyman v. Campbell,*

6 Porter, 217; 3 Gill, 138; 9 Cow. 437; 1 Bish. C. L. § 75; *Rex v. Paine,* 1 East's P. C. 5; *Jock v. Miller,* 3 Stew. & Por. 13; 3 Greene, (Iowa,) 329.

Punishment is not of the essence of the offense; it is in the nature of the remedy, and, when mitigated, is not in violation of the constitutional provision against *ex-post-facto* laws.—Bishop, Cr. L. §§ 103–108; Story on Con. § 1345. If the Code is taken as a system, and to be construed as such as to freedmen after their liberation, then, where it was by the action of Governor Parsons' proclamation put in force, except the slave laws, a part of that system being sections 12 and 14 was also put in force as a part of that system as to freedmen; and those saving clauses or sections should be held to apply to crimes committed during the war, or before the slaves were free, and they became free before the issuance of the proclamation; for, as to the freedmen or slaves, sections 3080, 3081, and 3082, were never in force as to them until the proclamation was issued. *Jeffries v. The State,* at this term.

The common-law rule was, that, if the statute contained no prohibitory clause, or negative, express or implied, the State could proceed, either under the statute, or at common law, where the offense was one at common law, and the statute only changed the punishment.—1 Bish. C. L. §§ 91, 93, 77, 88, and authorities cited by him.

My opinions on these questions are given at large in the case of *Burt (a freedman) v. The State,* and the authorities there cited. But my brethren not concurring in the application of the principles held by me to this case, in conformity to their opinion let an entry be made, reversing the judgment, and discharging the prisoner from custody, as in the case of *Burt v. The State,* at the present term.

JUDGE, J.—The evidence upon which the prisoner was convicted, was entirely circumstantial; and a charge was requested and refused, as to the measure of conviction necessary to be produced on the minds of the jury by this species of evidence, before they could find the prisoner guilty; and a question also arises upon defects in the record, which might be supplied by a *certiorari.* But the

view taken of the case by the Chief-Justice and myself, renders it unnecessary to pass upon any of these questions.

At the time of the commission of the offense, the prisoner was a slave, and the person slain was a slave. These facts were averred in the indictment, and were sustained by the proof. We may concede that slavery was known to the common law. We do concede that the offense charged in this case was murder at the common law, and this without regard to the *status* of the slayer or the slain ; and we also concede that the punishment of murder, at the common law, was death. A statute of this State, in force when the offense was committed, may be read as follows : " Every slave, who is guilty of murder, shall, on conviction, suffer death."—Code, § 3312. And we may concede, without affecting the result, though we do not assert the proposition, that this statute was merely declaratory of the common law. Yet, notwithstanding these concessions, it is incontrovertibly true that, at the time of the commission of the offense charged, and for a long period prior thereto, none but slaves, *as slaves*, could be punished, in this State, unconditionally with death, as at the common law, for murder. How, and why was this so ? It was not in virtue alone of section 3312 of the Code, above quoted ; it was also by virtue of sections 3080, 3081, and 3082, which provide in substance as follows :

1. A definition of murder in the first degree, and a declaration that any person guilty of murder in the first degree, must, on conviction, suffer death, or imprisonment in the penitentiary for life, at the discretion of the jury trying the case.

2. A declaration that every homicide, committed under such circumstances as constituted murder at the common law, and which is not murder in the first degree, is murder in the second degree ; and that, on conviction for this offense, the offender must be imprisoned in the penitentiary, for not less than ten years.

3. That, upon any indictment for murder, the jury finding the offender guilty, must ascertain by their verdict whether it is murder in the first or second degree ; and that

sentence must be pronounced in accordance with the finding of a jury, in all cases, even though the prisoner, upon arraignment, confesses his guilt.

These sections of the Code never applied to slaves; were prohibited from being thus applied, by section 3305; but, from the date of their enactment, they applied to all persons in the State, of whatever class, except slaves; and since the destruction of slavery, they apply to all persons in the State of every class. It was decided by this court, unanimously, in the case of *Eliza v. The State*, at the present term, that they became applicable to freedmen, *eo instanti*, on their becoming such; but they cannot be allowed to prescribe the punishment of prior offenses, for obvious reasons, hereafter noticed.

Thus it very clearly appears that, by the statutes of Alabama, there was but one class of persons in the State, before the abolition of slavery, who could be punished unconditionally with death, as at the common law, for murder; *and that was the class known as slaves.*

Now, what effect did the abolition of slavery have on this legislation of the State relating to the punishment of murder? In the case of *George v. The State*, at the present term, Justice BYRD not sitting, this court held, that all the penal statutes of the State, applicable to slaves exclusively, have been abrogated by the destruction of the institution, and by the consequent changes made in the fundamental law, which created a repugnancy between it and the statutes, and between the statutes and the genius and policy of the State. This opinion has not been directly assailed, though my brother BYRD intimated his disapprobation of it, in his dissenting opinion in *Burt v. The State*, at the present term. It is believed that the decision in *George v. The State* is founded upon unassailable argument and authority.

This being the case, what has become of section 3312 of the Code, which declares, that "every slave, who is guilty of murder, shall, on conviction, suffer death?" It was abrogated with the other statutes of the slave code.

We are willing to concede that, when a statute is declaratory merely of the common law, and is simply repealed,

the repeal does not affect the common law : *that* remains in force, if there be no other enactment, at the time of the repeal, which supersedes the common law in the particular of the statute ; and if such was this case, and section 3312 was merely declaratory of the common law, there would be no difficulty in remanding the cause for another trial. But such is not this case. On the abrogation of section 3312, the provisions of the Code dividing murder into degrees, and providing punishment for each degree of the offense, became of universal application, and as universally excluded, by completely superseding, the common-law punishment for murder. By what process, then, can these provisions of the Code be thrust aside, and the common-law punishment for murder, unconditional death, be erected in their stead, *for the trial of a particular case, or of a particular class of cases?* The Code punishment, and the common-law punishment, both cannot exist together, for they are in direct repugnancy ; and if it is competent for the legislature to change by statute any common-law rule, (a thing never yet doubted,) surely, the common-law punishment for murder has been changed in this State, by the provisions of the Code above referred to.

The question is precisely the same as if the legislature had abolished slavery, repealed section 3312 of the Code, with no saving clause as to offenses committed under it prior to the repeal, and at the same time, and in the same act, had made the sections of the Code relating to the punishment of murder, applicable to freedmen.

Should this cause be remanded, then, under what law could the prisoner be punished? Not under the statute which was in force against him *as a slave*, when the offense was committed; for he is no longer a slave, and that statute has been abrogated, with no saving proviso as to offenses committed under it while it was in force. Not under the common law, for that punishment for murder has been superseded by the Code. Not under the Code, for that had no application to him when the offense was committed; and he cannot be punished under an *ex-post-facto* law, which would not only violate the constitution of the United States, but also the 8th section of the bill of rights

of this State, which declares, that "no person shall be punished, but in virtue of a law established and promulgated *prior* to the commission of the offense." It results, then, that he could be punished under no law, unless, as we think, the court trying him should resort to legislation, under the mask of judicial construction.—See *Burt v. The State*, at the present term.

It is not pleasant to the Chief-Justice and myself to be forced to this conclusion ; but we come to it under the guidance of the stern and inflexible rules of the law ; and thus guided and controlled, we are not at liberty to announce a different result, regardless of the character of the case, or of whom it may relieve from punishment.